In the

# United States Court of Appeals

## For the Seventh Circuit

No. 22-1037

MICHELLE R. GILBANK,

*Plaintiff-Appellant,*

*v.*

WOOD COUNTY DEPARTMENT OF HUMAN SERVICES, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:20-cv-00601-jdp — James D. Peterson, *Chief Judge*.

ARGUED FEBRUARY 6, 2024 — DECIDED AUGUST 1, 2024

Before SYKES, *Chief Judge*, and EASTERBROOK, ROVNER, HAMILTON, BRENNAN, SCUDDER, ST. EVE, KIRSCH, JACKSON-AKIWUMI, LEE, and PRYOR, *Circuit Judges*.[*]

---

[*] Circuit Judges Kolar and Maldonado did not participate in consideration of this case. Senior Circuit Judge Hamilton participated in the en banc hearing as a member of the panel originally assigned to this case, along with Judges Kirsch and Pryor. See 28 U.S.C. § 46(c).

HAMILTON, *Circuit Judge*. At the center of this federal case is a child-protection case in a Wisconsin state court. After losing custody of her daughter in state-court proceedings and regaining custody a year later, plaintiff Michelle Gilbank filed this lawsuit in federal court. She alleges that many officials involved in the state-court proceedings violated her federal constitutional rights. The district court granted summary judgment for all defendants, finding that some of Gilbank's claims were barred by the *Rooker-Feldman* doctrine and that all other claims failed on the merits. Gilbank's appeal was argued to a panel. We then decided under Circuit Rule 40(e) to hear the case en banc. The full court heard argument on February 6, 2024.[1]

We offer this roadmap for the three opinions and shifting majorities. First, a majority of the en banc court has voted to affirm the judgment of the district court dismissing this action. That will be the mandate of the court. Second, all members of the en banc court agree to affirm summary judgment for defendants on the merits of Gilbank's claims for alleged injuries not caused by the state courts' judgments, as explained in Part VIII.

The picture on the *Rooker-Feldman* issue is more complex. Five of the eleven judges participating (Judges Rovner, Hamilton, Brennan, Jackson-Akiwumi, and Pryor) join all of this opinion. A majority of the en banc court, those five judges plus Judge Easterbrook, joins Parts I—III, V, VI, and VIII of

---

[1] After plaintiff Gilbank briefed her appeal pro se, we recruited counsel for her. Attorneys Joseph S. Diedrich and Kirsten Adrienne Atanasoff and the firm of Husch Blackwell, LLP have ably represented plaintiff Gilbank before the panel and the en banc court. They have the thanks of the court.

this opinion, so those portions of this opinion are an en banc majority opinion. In these sections, we reject Gilbank's assertion that she lacked a reasonable opportunity to litigate her claims in state court, and we eliminate the "fraud exception" to the *Rooker-Feldman* doctrine.

A different majority of the court, including Judge Easterbrook (with Chief Judge Sykes and Judges Scudder, St. Eve, Kirsch, and Lee), joins Part I of Judge Kirsch's opinion, making that portion also an en banc majority opinion. That section holds that jurisdiction over Gilbank's claims for injuries allegedly inflicted by the state court's judgments is not barred by the *Rooker-Feldman* doctrine because they do not seek a federal district court's review and rejection of the state court's judgments. Part IV of this opinion dissents from Part I of Judge Kirsch's majority opinion on this issue. Part VII of this opinion, which responds to Judge Easterbrook's concurring opinion, is also joined by only five judges.

All judges agree that we should no longer rely on the "inextricably intertwined" language that has contributed to confusion in applying the *Rooker-Feldman* doctrine. All judges also agree that the *Rooker-Feldman* doctrine, whatever its proper scope, should not recognize what we describe below as a "fraud exception." And all members of the en banc court agree that our different understandings of the *Rooker-Feldm*an doctrine may help show a need for the Supreme Court to clarify application of the doctrine, especially in the types of cases where the lower courts often confront it, including child-custody and mortgage-foreclosure cases.

I.  *Factual Background & Procedural History*

   A.  *Plaintiff's Early Encounters with Police and Child Welfare Officials*

Because we are reviewing a grant of summary judgment, we present the facts in the light most favorable to Gilbank as the non-moving party, giving her the benefit of the doubt when it comes to conflicting evidence and reasonable inferences that can be drawn from the evidence. E.g., *Sullivan v. Flora, Inc.*, 63 F.4th 1130, 1141 (7th Cir. 2023). Plaintiff Michelle Gilbank had sole custody of her young daughter T.E.H. until the girl's father, Ian Hoyle, was granted supervised visitation rights in November 2017. T.E.H. was three years old at the time. The relationship between Gilbank and Hoyle was fraught. Hoyle had a prior conviction for first-degree sexual assault of a six-year-old girl and frequently drank and used drugs. Gilbank too had a history of drug use, particularly methamphetamine. Nevertheless, in February or March 2018, when the home where they lived went into foreclosure, Gilbank and T.E.H. moved into Hoyle's apartment.

On June 29, 2018, an anonymous caller contacted the Wood County Department of Human Services about Gilbank and T.E.H. The weather was hot, and they appeared to be living in Hoyle's garage, which lacked air conditioning. Defendant Marshfield Police Department sent two officers, one of whom was defendant Detective Derek Iverson, to respond to the call. The officers were joined by a social worker from Human Services, defendant Theresa Heinzen-Janz. The officers and social worker spoke with Gilbank and observed that T.E.H. appeared well cared for and in good health. Gilbank expressed concern about living with Hoyle. Heinzen-Janz agreed to help, scheduling an appointment for July 3.

Before that appointment, Heinzen-Janz reviewed Gilbank's history with Human Services. She learned that Gilbank had a history of drug problems and had a pending charge for methamphetamine possession from August 2017. Just before the appointment, Heinzen-Janz and Iverson met with Hoyle, who told them that he was concerned about Gilbank's drug use and that he wanted her to move out.

At the meeting on July 3, Heinzen-Janz gave Gilbank contact information for local housing resources. Detective Iverson and Heinzen-Janz also pressed Gilbank about her drug use. Gilbank acknowledged her history with methamphetamine but denied having used the drug for a few weeks. Iverson asked Gilbank to take a drug test. She agreed to provide a urine sample, which came back positive for methamphetamine. When Heinzen-Janz and Iverson shared the results with her, Gilbank insisted the test results were wrong. She later admitted to having smoked methamphetamine "residue" just two days before the test.

B. *Plaintiff is Arrested and Loses Custody*

August 21, 2018 was a pivotal day for this case. Hoyle asked Gilbank for a ride to work. After Gilbank and T.E.H. dropped him off, an officer pulled Gilbank over for driving with a suspended license. A drug-sniffing dog alerted to the presence of a controlled substance. While officers searched the vehicle, Gilbank called Hoyle and asked him to come to the scene and care for T.E.H. The search uncovered drug paraphernalia and 0.7 grams of methamphetamine. Gilbank was arrested. Her daughter left with Hoyle.

Gilbank was taken to the Marshfield Police Department and interviewed by Detective Iverson and Heinzen-Janz.

After Iverson gave her *Miranda* warnings, Gilbank said that she did not want to answer questions without a lawyer present. Iverson said that he would not ask Gilbank about the drugs and paraphernalia found in her vehicle, but he and Heinzen-Janz both told Gilbank that they needed to have a frank conversation about her drug use to the extent it affected T.E.H. Without an honest dialogue, they said, Heinzen-Janz could not create a safety plan to allow T.E.H. to remain with her.

Gilbank decided to talk. She said that she never used methamphetamine around T.E.H. and that she was making progress. After Detective Iverson questioned her truthfulness, Gilbank became defiant—claiming she did not have a problem with methamphetamine—and refused to talk any further. Heinzen-Janz then told Gilbank that the county would be taking temporary physical custody of T.E.H. and placing her with Hoyle, that a hearing would be held in a day or two, and that Heinzen-Janz would call Gilbank to tell her the date and time of the hearing. Gilbank was booked and taken to the Wood County Jail.

The next day, August 22, Heinzen-Janz filed two documents in the Wood County Juvenile Court: a request for temporary physical custody of T.E.H. and a "CHIPS" petition ("Child in Need of Protective Services") under Wis. Stat. § 48.13(10) (child's physical health seriously endangered). The request detailed how Gilbank had been taken into custody, refused to acknowledge her addiction, and refused to cooperate with safety planning. The request recommended that T.E.H. be placed temporarily with Hoyle. The petition echoed the request and noted that Gilbank's association with methamphetamine users and dealers, who had "regular

access" to T.E.H., put the child "at repeated risk for imminent harm"—a danger that Gilbank "failed to recognize."

The state court scheduled a temporary physical custody hearing for the next day, August 23. Heinzen-Janz called the jail to give Gilbank the details. Jail staff said they would notify Gilbank of the hearing. Gilbank had already been released, though, so despite Heinzen-Janz's efforts, Gilbank did not receive notice of the hearing. Gilbank happened to go to the courthouse that day to inquire about the 48-hour hearing, only to learn that it had already been held earlier that day without her.

C. *State-Court Proceedings*

At the hearing on August 23, 2018, the juvenile court addressed temporary physical custody. The child's father (Hoyle), Heinzen-Janz, an assistant district attorney, and a guardian ad litem appointed to represent T.E.H. were present. Gilbank was not. The court found that the information in the temporary custody request established probable cause to believe that Gilbank was unable to provide adequate care and supervision of T.E.H. or was neglecting her, so the court ordered T.E.H. be placed with Hoyle until the next hearing.

The next day, after learning of the order, Gilbank wrote a letter to the presiding judge contesting the court's temporary physical custody order. She followed up by filing a motion to dismiss. Gilbank objected to the order on several grounds, including that she had not received notice of the hearing. Gilbank also moved to reopen the probable cause hearing. The court denied both motions but noted that Gilbank was "welcome" to use the appeals processes of the Wisconsin courts

"any time that that's appropriate." A CHIPS hearing was scheduled for September 25.

Gilbank attended the September 25 CHIPS hearing and was represented by an attorney. She did not testify. Detective Iverson and social worker Heinzen-Janz testified to the events leading to Gilbank's temporary loss of custody, ending with her arrest on August 21, 2018. Heinzen-Janz also testified that Gilbank had admitted using methamphetamine as recently as August 23, the day of the temporary custody hearing. The guardian ad litem recommended that T.E.H. stay with Hoyle.

The court found these witnesses credible. The court found that Gilbank suffered from "a very serious methamphetamine addiction," that necessary care for T.E.H. would require "sober parenting," and that clear and convincing evidence showed that T.E.H. was a child in need of protection and services. The court ordered supervision for a period not to exceed one year. Pending a follow-up hearing to be held on October 29, the court ordered that T.E.H. remain with Hoyle.

At the October 29 hearing, Heinzen-Janz testified that T.E.H. should remain with Hoyle because of Gilbank's continuing drug use. Until the extent of Gilbank's methamphetamine use was clear, Heinzen-Janz said, she could not establish a plan for safely allowing Gilbank to have custody of T.E.H. Still represented by counsel, Gilbank testified at that hearing. She testified that she had not used methamphetamine for several months. Finding that Gilbank was not forthright about her methamphetamine addiction and that T.E.H. could not be placed safely with her, the court ordered continued placement with Hoyle.

Eleven months later, on September 9, 2019, the court held a closure hearing on the CHIPS petition. By then, a separate case in family court was addressing custody and placement of T.E.H., so all parties, including Gilbank, agreed to close the CHIPS proceedings. The court agreed. In March 2020, Gilbank regained sole custody of T.E.H. in that separate proceeding. There were no further relevant proceedings in state court.[2]

D. *This Federal Lawsuit*

Proceeding without a lawyer, Gilbank filed this federal lawsuit in June 2020, naming as defendants nearly everyone involved from the first welfare check in June 2018 to the conclusion of the CHIPS proceedings—from state-court judges to social workers to police officers. The complaint alleged numerous constitutional claims on behalf of Gilbank and T.E.H., primarily under 42 U.S.C. § 1983, as well as conspiracy claims under 42 U.S.C. §§ 1985 and 1986. In December 2020, the district court dismissed T.E.H. as a plaintiff and dismissed some of Gilbank's claims. *Gilbank v. Wood County Dep't of Human Servs.*, 2020 WL 7364511, at *1, *5–6 (W.D. Wis. Dec. 15, 2020). Plaintiff also withdrew several more claims during discovery and later briefing.[3]

---

[2] Gilbank's Amended Complaint in federal court alleged that Hoyle admitted having touched T.E.H.'s genitals daily and that his admission led to the March 2020 decision granting Gilbank sole custody. However, there was no finding, admission, or even admissible evidence in our record of sexual assault or other wrongdoing. Still, Hoyle's history of sexual abuse of another child and Gilbank's methamphetamine use show starkly how difficult such decisions about child custody can be.

[3] The district court dismissed as untimely all Section 1986 conspiracy claims against individual social workers. *Gilbank*, 2020 WL 7364511, at *5–6. The parties debate whether the district court also dismissed plaintiff's

By the time the district court ruled on cross-motions for summary judgment, the remaining defendants were the Marshfield Police Department, Detective Iverson, and four Wood County social workers, including Heinzen-Janz. The remaining claims were: (1) unreasonable search by compelling plaintiff to provide a urine sample; (2) unreasonable seizure and violations of substantive due process by removing T.E.H. from plaintiff's custody; (3) denial of procedural due process by continuing to interrogate plaintiff after she had requested an attorney; (4) unreasonable seizure by evicting plaintiff from her home; (5) violations of substantive due process by interfering with family integrity; (6) violations of 42 U.S.C. § 1985 by conspiring to remove T.E.H. from plaintiff's custody; (7) a *Monell* claim against the Marshfield Police Department for enforcing policies and practices that led to the alleged constitutional violations; (8) denial of procedural due process by failing to provide plaintiff with notice prior to the temporary physical custody hearing on August 23, 2018; (9) denial of procedural due process by making fraudulent statements in the CHIPS proceedings; and (10) violations of state statutes governing protective custody.

The district court concluded that plaintiff's principal claims were based on injuries caused by the state court's orders in the CHIPS proceedings and were therefore barred by the *Rooker-Feldman* jurisdictional doctrine. *Gilbank v. Marshfield Police Dep't*, 2021 WL 5865453, *5–6 (W.D. Wis. Dec. 10,

---

Section 1985 claims as untimely. We do not read the court's order as dismissing those claims. The dismissal order focused almost entirely on Section 1986. Since the court ultimately found no underlying constitutional violations within its jurisdiction, it may have seen no need to address the Section 1985 claims.

2021). Plaintiff argued, however, that "some of her injuries occurred prior to, and exist independently of, the state court's custody decision." *Id.* at *6. Plaintiff contended that three of her claims—unreasonable search via urinalysis, interrogation without an attorney, and lack of notice—were not subject to *Rooker-Feldman* because they were based on those prior, independent injuries. The district court granted summary judgment for defendants on the merits of those three claims. *Id.* at *6–7. The court found that plaintiff had consented to the urinalysis, that her Fifth Amendment claim failed because none of her statements were ever used against her in a criminal proceeding, and that her due process claims were barred by issue preclusion. The district court also granted summary judgment for defendants on Gilbank's other due process claim, finding that any failures to abide by state statutory requirements were insufficient to state a claim for a federal due process violation. *Id.* at *7.

II. *Standards of Review*

Because the *Rooker-Feldman* doctrine operates as a "jurisdictional bar," *Andrade v. City of Hammond*, 9 F.4th 947, 948 (7th Cir. 2021), we must consider first whether the district court had subject-matter jurisdiction before reviewing the merits of any claim. *Swartz v. Heartland Equine Rescue*, 940 F.3d 387, 390 (7th Cir. 2019); see also *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) ("Without jurisdiction the court cannot proceed at all in any cause …."), quoting *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1998). We review de novo both a district court's conclusion that it lacks subject-matter jurisdiction and its grant of summary judgment on the merits of claims within its jurisdiction. *Andrade*, 9 F.4th at 949 (jurisdiction); *Pierner-Lytge v.*

*Hobbs*, 60 F.4th 1039, 1043 (7th Cir. 2023) (summary judgment). *Rooker-Feldman* is properly applied on a claim-by-claim basis. See *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 486–87 (1983) (concluding that the district court lacked jurisdiction over some of plaintiffs' claims but not others); *Crawford v. Countrywide Home Loans, Inc.*, 647 F.3d 642, 646–47 (7th Cir. 2011) (same); *Behr v. Campbell*, 8 F.4th 1206, 1213 (11th Cir. 2021); *In re Isaacs*, 895 F.3d 904, 912 (6th Cir. 2018); *Henrichs v. Valley View Development*, 474 F.3d 609, 613 (9th Cir. 2007).

III. *The Rooker-Feldman Doctrine*

From the earliest days of this federal Republic, the parallel federal and state court systems have offered opportunities for litigants disappointed in one court system to seek a better result in the other. See *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 408 (6th Cir. 2020) (Sutton, J., concurring) ("In our legal system of overlapping state and federal jurisdiction, dueling resolutions of claims and issues are a national litigation reality.") For just as long, Congress and state and federal judges have debated and adjusted the boundaries of appropriate roles for state and federal courts. The *Rooker-Feldman* doctrine has emerged from those debates.

A.  *Basics of the Rooker-Feldman Doctrine*

Under 28 U.S.C. § 1257(a), only the Supreme Court is "vested with appellate authority over state courts." *Sykes v. Cook County Circuit Court Probate Div.*, 837 F.3d 736, 741 (7th Cir. 2016). The *Rooker-Feldman* doctrine recognizes that Congress has not "authorize[d] district courts to exercise appellate jurisdiction over state-court judgments." *Verizon*

*Maryland, Inc. v. Public Serv. Comm'n of Maryland*, 535 U.S. 635, 644 n.3 (2002), citing 28 U.S.C. § 1257(a).

The doctrine takes its name from *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). Our application of *Rooker-Feldman* today is guided by the Supreme Court's authoritative restatement of the doctrine in *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280 (2005).

*Exxon Mobil* emphasized the "limited circumstances" where *Rooker-Feldman* should apply, cautioning that the doctrine has no place "overriding Congress' conferral of federal-court jurisdiction concurrent" with the jurisdiction of state courts or "superseding the ordinary application of preclusion law…." 544 U.S. at 283, 291. Our application of *Rooker-Feldman* must neither interfere with our "'virtually unflagging obligation' to exercise the jurisdiction that Congress" has granted, *Huon v. Johnson & Bell, Ltd.*, 657 F.3d 641, 645 (7th Cir. 2011), quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), nor swallow up issues that are properly resolved under abstention or claim- and issue-preclusion doctrines. In short, *Rooker-Feldman* must stay in its lane, allowing comity and abstention doctrines to do the work, when necessary, "to stay or dismiss the federal action in favor of the state-court litigation," and using preclusion principles to prevent a party from relitigating "in federal court a matter previously litigated in state court." *Exxon Mobil*, 544 U.S. at 292–93.

*Rooker* and *Feldman* are the only two cases in which the Supreme Court itself has actually applied the doctrine to reject federal jurisdiction. Given the tendency of disappointed litigants to seek new forums to vindicate their claims or

defenses, though, the doctrine has been invoked in tens of thousands of circuit and district court decisions since *Exxon Mobil*. Along with abstention and jurisdictional doctrines, it is part of the arsenal of federalism doctrines that circuit and district judges must consider on a regular basis.

*Exxon Mobil* teaches that district courts should disclaim jurisdiction only in "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." 544 U.S. at 284. Phrased that way, the doctrine blocks federal jurisdiction when four elements are present. *First*, the federal plaintiff must have been a state-court loser. *Second*, the state-court judgment must have become final before the federal proceedings began. *Third*, the state-court judgment must have caused the alleged injury underlying the federal claim. *Fourth*, the claim must invite the federal district court to review and reject the state-court judgment.

Our case law has added to the four elements in *Exxon Mobil* a fifth that the Supreme Court has not had occasion to address directly. *Rooker-Feldman* does not apply to bar jurisdiction over a plaintiff's federal claim if she did not have a reasonable opportunity to raise her federal issues in the state courts. *Andrade*, 9 F.4th at 950, quoting *Jakupovic*, 850 F.3d at 902.

The first two *Exxon Mobil* elements are satisfied here. Plaintiff lost in state court, and the state-court judgments were final before she brought this action in federal court.

B.  *The Third Element—Injured by a State-Court Judgment*

The third element of the *Rooker-Feldman* doctrine asks whether the state-court judgments caused the alleged injury underlying the claim. Our case law has developed useful principles for dealing with the injury element. Most basic, as *Exxon Mobil* teaches, *Rooker-Feldman* bars claims where only the state-court judgment itself caused the alleged injury underlying the claim. 544 U.S. at 284. See also *Swartz*, 940 F.3d at 392 (*Rooker-Feldman* barred claims where only "alleged injury," the seizure of plaintiffs' livestock, "was directly caused by the state court's orders"); *Jakupovic v. Curran*, 850 F.3d 898, 903–04 (7th Cir. 2017) (*Rooker-Feldman* barred claims where defendants simply "executed the state court's bond condition and order"); *Kelley v. Med-1 Solutions, LLC*, 548 F.3d 600, 605 (7th Cir. 2008) (*Rooker-Feldman* barred claims where defendants could have obtained sought-after attorney fees only by award of state court).

On the other hand, claims based on injuries that are "independent" of the state-court judgment (i.e., injuries that were not caused by that judgment) are not barred. See *Exxon Mobil*, 544 U.S. at 293 ("If a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party …, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'"), quoting *GASH Assocs. v. Village of Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993). Where, for example, an injury was complete before the state-court judgment was rendered, the judgment could not have caused the injury, so a claim based on that injury is independent. See *Andrade*, 9 F.4th at 948, 950–51 (claims not barred where challenged conduct, an adverse

administrative determination regarding rental property, "occurred before any judicial involvement"); *Iqbal v. Patel*, 780 F.3d 728, 730 (7th Cir. 2015) (claims not barred because challenged racketeering enterprise "predate[d] the state litigation and caused injury independently of it").

In another common pattern where *Rooker-Feldman* does not apply, the federal plaintiff was also a plaintiff in state court, lost in a case seeking relief for injuries inflicted by the state-court defendant, and wants to relitigate the dispute in federal court. *Exxon Mobil* said what this circuit has long made clear: *Rooker-Feldman* does not bar federal jurisdiction in such a case. Doctrines of claim- and issue-preclusion will often apply to bar relitigation, see 544 U.S. at 293, quoting *GASH Assocs.*, 995 F.2d at 728, but there is no jurisdictional bar.[4]

In short, *Exxon Mobil*'s injury element hinges on whether the federal claim alleges an injury "caused by the state court judgment" or "an independent prior injury that the state court failed to remedy." *Sykes*, 837 F.3d at 742. We now apply this test to plaintiff's claims in this case.[5]

---

[4] For other recent cases in this circuit addressing *Rooker-Feldman*, see *Jakupovic*, 850 F.3d at 902–04; *Sykes*, 837 F.3d at 741–43; *Kelley*, 548 F.3d at 603–06; *Taylor v. Fed. Nat'l Mortg. Ass'n*, 374 F.3d 529, 532–35 (7th Cir. 2004); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554–59 (7th Cir. 1999); *Centres, Inc. v. Town of Brookfield*, 148 F.3d 699, 701–03 (7th Cir. 1998); *Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506, 509–12 (7th Cir. 1996); *Young v. Murphy*, 90 F.3d 1225, 1230–33 (7th Cir. 1996); *Garry v. Geils*, 82 F.3d 1362, 1364–70 (7th Cir. 1996) (*Rooker-Feldman* does not apply where injury exists "apart from the loss in state court"); *Homola v. McNamara*, 59 F.3d 647, 650 (7th Cir. 1995); *GASH Assocs.*, 995 F.2d at 729.

[5] In line with many of our cases, *Sykes* referred to this analysis as the "'inextricably intertwined' determination." 837 F.3d at 742. This "inextricably intertwined" language appeared in *Feldman*: federal claims are

### 1. *Claims Alleging Injuries from State-Court Judgments*

Plaintiff Gilbank's central claims allege injuries inflicted by the state-court judgments taking away custody of T.E.H. The only injury plaintiff claims to have suffered after the temporary physical custody hearing held on August 23, 2018 was being deprived of custody of T.E.H. pursuant to the state court's orders. We appreciate how serious that injury may have been. State courts have in their hands our lives, liberties, and livelihoods, as well as our property, dignity, and reputations. In cases like this, they have our families in their hands. Some of their decisions are incorrect, as are some federal-court decisions. In a much, much higher proportion of cases,

---

inextricably intertwined with the state court's judgment where the federal court "is in essence being called upon to review the state court decision." 460 U.S. at 482 n.16 & 486–87. The phrase has been frequently criticized. E.g., *Andrade*, 9 F.4th at 954 (Sykes, C.J., concurring) (suggesting that our "continued recitation of the inextricably intertwined test isn't just harmless gloss" on the post-*Exxon Mobil* doctrine and arguing that we should "avoid the 'inextricably intertwined' framing"); *Behr v. Campbell*, 8 F.4th 1206, 1211 (11th Cir. 2021) (placing the phrase "at the root of the many mistaken *Rooker-Feldman* dismissals"); *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 406 (6th Cir. 2020) (Sutton, J., concurring) (calling the phrase "a prolific source of controversy"); *Milchtein v. Chisholm*, 880 F.3d 895, 898 (7th Cir. 2018) ("[T]he phrase 'inextricably intertwined' … should not be used as a ground of decision."). We agree that it is difficult to discern a "bright line that separates" the "inextricably intertwined" from the "not so intertwined," see *Ritter v. Ross*, 992 F.2d 750, 754 (7th Cir. 1993), and courts may ponder the imponderable by asking whether a claim is intertwined, "'inextricably' or extricably," with a state-court judgment, *Richardson v. Koch Law Firm, P.C.*, 768 F.3d 732, 734 (7th Cir. 2014). The Supreme Court has never explicitly discarded the phrase, but the Court did not use it in *Exxon Mobil* and has not otherwise explained it. All judges agree here that the "inextricably intertwined" language is not useful in analyzing questions under *Rooker-Feldman*.

though, losing parties *believe* the courts have erred. See *Homola v. McNamara*, 59 F.3d 647, 648 (7th Cir. 1995).

The high stakes and the possibility of errors, even egregious errors, do not affect application of the *Rooker-Feldman* doctrine. The very starting point for the analysis is the assumption that a state-court judgment was wrong and injured the federal plaintiff. See *Rooker*, 263 U.S. at 415–16 (assuming state court erred); *Lennon v. City of Carmel*, 865 F.3d 503, 506 (7th Cir. 2017) ("There is no exception for egregious error." (citing *Kelley*, 548 F.3d at 603)).

Because plaintiff's injury in the loss of custody was "effectuated" only by the state court's temporary and longer-term orders on August 23 and October 29, 2018, respectively, those claims based solely on that injury satisfy the third *Exxon Mobil* element. See *Swartz*, 940 F.3d at 391. These claims include the alleged violations of: (1) procedural due process for want of notice before the August 23 hearing; (2) state statutes governing protective custody; (3) substantive due process by interfering with family integrity after the court's temporary physical custody order; and (4) procedural due process by making fraudulent statements in state courts in the CHIPS petition and later proceedings.

Plaintiff's procedural due process claim, alleging that she did not receive notice of the temporary physical custody hearing, satisfies the third element because the failure of notice would have been harmless if the August 23 hearing had gone her way. Her temporary loss of custody of T.E.H. arose from a state-court order. That claimed injury satisfies the third *Exxon Mobil* element of the *Rooker-Feldman* doctrine. See 544 U.S. at 284. So too with any alleged violations of state statutes. The only injury these claims allege "was effectuated by" the

state court's orders. See *Swartz*, 940 F.3d at 391. Likewise, plaintiff's substantive due process claim—interference with family integrity—alleges injury only by the state-court judgments that deprived her of custody of her daughter. On these claims, we move on to the fourth *Exxon Mobil* element in Part IV.

2. *Injuries Complete Before State-Court Judgments*

*Rooker-Feldman* does not apply to plaintiff's other claims because they assert injuries that were complete prior to the state court's temporary physical custody order of August 23, 2018. Those claims do not satisfy the third *Exxon Mobil* element. For example, any injury plaintiff suffered when she provided a urine sample on July 3 occurred before the state-court proceedings began. The same is true of any injuries plaintiff suffered by being interrogated without an attorney and evicted from Hoyle's apartment on August 21. Likewise, to the extent that plaintiff's substantive due process claim alleges interference with family integrity before the state court's temporary physical custody order of August 23, *Rooker-Feldman* does not bar the claim.

Plaintiff's Fourth Amendment and substantive due process claims relating to the removal of T.E.H. on August 21 involve one extra twist. The state court later approved the initial removal when it found probable cause on August 23. These claims might therefore seem to invite "review and rejection" of the state court's finding. But plaintiff's injuries flowing from T.E.H.'s removal began the moment she no longer had custody of her daughter. Any injuries sustained from August 21 until the court order two days later were not caused by the state court's order. So even if these claims question "a legal conclusion" that the state court reached later, the claims are

for *Rooker-Feldman* purposes still "independent" of the state court's August 23 judgment. See *Exxon Mobil*, 544 U.S. at 293, quoting *GASH Assocs.*, 995 F.2d at 728. As we explain below in Part VIII, all judges agree that these claims fail on the merits for other reasons. But the fact that the injuries preceded the state court's judgments means that these claims do not satisfy the third element under *Exxon Mobil*, so jurisdiction over these claims is not blocked by *Rooker-Feldman*. See *id.*

Finally on this topic, because jurisdiction is proper over these alleged constitutional violations, plaintiff's *Monell* and conspiracy claims, which rely on these same alleged violations, are likewise not barred by *Rooker-Feldman*.

IV. *The Controversial Fourth Element: "Review and Reject" the State Court Judgment*

The fourth element under *Exxon Mobil* is that the federal claim must invite "review and rejection" of the state court judgments in question. 544 U.S. at 284. That element of the *Rooker-Feldman* doctrine divides this court. I believe that plaintiff's claims for damages for injuries inflicted by state court judgments invite "review and rejection" of those judgments, so that *Rooker-Feldman* bars jurisdiction here. But a majority of the en banc court disagrees in Judge Kirsch's opinion, as joined in part by Judge Easterbrook. This Part IV should thus be read as a dissent from Part I of Judge Kirsch's opinion.

Among the three opinions in this case, no one disputes that plaintiff Gilbank was a state-court loser (*Exxon Mobil*'s first factor), that the state-court judgments were final before she filed her federal case (second), and that she claims that the state-court judgments injured her (third). The majority takes the approach, though, that plaintiff's claims based on injuries

inflicted by the state-court judgments do not invite a federal court to "review and reject" those state-court judgments. So long as plaintiff is seeking only monetary damages rather than a federal-court order directly nullifying the state court's custody orders, the majority reasons, *Rooker-Feldman* does not apply and the federal court is free to decide those damages claims on their merits.

On this issue, this en banc decision marks a dramatic departure from this circuit's precedents, a departure that I view as erroneous and unjustified. I explain next in Part IV-A why the new majority is misreading *Exxon Mobil*. Part IV-B addresses this circuit's precedents and why a departure from *stare decisis* is not justified here. Part IV-C explains why the majority's new approach to *Rooker-Feldman* will produce arbitrary, impractical, and troubling results.

A. *Exxon Mobil's Fourth Element*

The majority argues that its new bright-line rule—that *Rooker-Feldman* does not apply to a federal claim for damages based on an injury inflicted by a state-court judgment—is required by *Exxon Mobil*. Judge Kirsch's opinion even describes *Exxon Mobil*'s key language as unambiguous. Post at 72. It is not.

The opinion in *Exxon Mobil* is not as clear as it could have been on the contours of this fourth element—inviting review and rejection of state-court judgments. That is not surprising because it was not the pivotal issue in that case. The federal case in *Exxon Mobil* did not come close to satisfying the doctrine. The federal case sought coercive relief and was filed just a few weeks after a mirror-image state-court action seeking declaratory relief was filed. That pattern is familiar when

parties are maneuvering for advantage in different courts, but it had nothing to do with *Rooker-Feldman*. The federal action satisfied none of the elements of the doctrine. It was filed before any state-court judgment had become final; the federal plaintiff had not lost in the state courts; without any state-court judgment no injury had been inflicted; and of course there was no state-court judgment to review and reject.

The *Exxon Mobil* opinion used many verbs to address this fourth element: review, reject, overturn, undo, reverse, set aside, and alter. 544 U.S. at 283–93. This was not the language of legal precision. In referring to the relief being sought in cases barred by *Rooker-Feldman*, the opinion used language with a decidedly practical bent. The key phrase, "inviting review and rejection," is not a legal term of art limited to a specific technical meaning. It invites a practical approach, one that cannot be avoided by artful pleading. Elsewhere the opinion said, for example, with emphases added: plaintiffs' complaints "*essentially* invited federal courts of first instance to review and reject unfavorable state-court judgments;" *id.* at 283; that the doctrine bars a party "from seeking what *in substance* would be appellate review" in a federal court; *id.* at 287; or that a new federal action "*in essence*, would be an attempt to obtain direct review" of state court decision; *id.* at 287–88 n.2.[6]

Until this en banc decision, this circuit has also consistently understood *Rooker-Feldman*, including this fourth

---

[6] The latter two of these quotations quoted in turn other Supreme Court opinions describing the doctrine. See also *Lance v. Dennis*, 546 U.S. 459, 466 (2006) (doctrine applies where "a party *in effect* seeks to take an appeal of an unfavorable state-court decision to a lower federal court" (emphasis added)).

"review and reject" element, in practical terms. On plaintiff's
four claims that should be barred by the doctrine, the only al-
leged injury is the deprivation of custody itself, as ordered by
the state trial court. So while these claims do not ask the fed-
eral district court in so many words "to reverse or modify"
those judgments, *Rooker*, 263 U.S. at 416, the claim is barred
because its premise is that the state-court judgments were
wrong, and there is "no conceivable way to redress" the al-
leged interference "without overturning" the state-court
judgments *ordering* that interference, *Jakupovic*, 850 F.3d at
903, quoting *Sykes*, 837 F.3d at 743, or, in terms of *Exxon Mobil*,
"reviewing and rejecting" those state-court judgments as in-
correct.

Several other considerations, apart from adherence to a
long line of circuit precedent, indicate that a practical applica-
tion fits the doctrine better than the majority's approach to
*Exxon Mobil* and decisive reliance on the form of relief sought.

First, if the *Rooker-Feldman* doctrine really embodied the
majority's simple, bright-line rule—that a federal claim seek-
ing damages for injuries inflicted by a state-court judgment
does not invite review and rejection—I would have expected
*Exxon Mobil* to have been direct and explicit about it. The short
opinion could have been even shorter. *Exxon Mobil* narrowed
the *Rooker-Feldman* doctrine, but nothing in the Court's opin-
ion signaled that the jurisdictional bar could be avoided by
the simple device of asking for damages rather than injunctive
relief. In one of our many cases rejecting the majority's new
theory, we wrote that, if plaintiff were correct on this point,
"federal courts could award damages every time a litigant in
state court used an improper procedure or considered evi-
dence that a federal judge does not think trustworthy. That

duplication would greatly increase the already high cost of civil litigation." *Harold*, 773 F.3d at 887. Cf. post at 73 (denying *Harold*'s point).

The focus of *Exxon Mobil* was more on the source of *injuries* than on the form of *relief*. 544 U.S. at 284 ("complaining of *injuries* caused by state-court judgments") (emphasis added). Our cases before *Exxon Mobil* had taught that a good way to keep *Rooker-Feldman* and preclusion doctrines in their proper lanes was to focus on the cause of the injury. *Exxon Mobil* took the same approach, and the Court quoted one of our precedents to make its point:

> If a federal plaintiff "present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party…, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion." *GASH Assocs.* v. *Rosemont*, 995 F.2d 726, 728 (C.A.7 1993); accord *Noel* v. *Hall*, 341 F.3d 1148, 1163–1164 (C.A.9 2003).

*Id.* at 293.

Second, the majority does not offer a reason why the Supreme Court would have drawn the majority's bright line for these purposes between seeking damages and injunctive relief. It is difficult to see such a reason. Federal courts do not take such an approach when parties invite state courts to review and reject federal-court judgments, as I explain below in Part IV-C. Why would the Supreme Court adopt such an approach when the roles are reversed?

Where the only injury underlying a claim was caused by the state-court judgment, there is simply no sensible way to separate the injury from the judgment that caused it. Redressing the injury—regardless of the form of relief requested— necessarily requires a federal court to review and reject the state-court judgment. Whether the claim asks the federal court to undo the state-court judgment or to compensate the state-court loser for injuries caused by that judgment, the result is the same: the state-court loser is in substance appealing her loss to the federal district court, seeking review and rejection of the state-court decision.

We cannot determine the merits of such a claim "without determining that the state court erred by issuing" its judgment. *Kelley*, 548 F.3d at 605. In those circumstances, we have explained, "when 'the injury is executed through a court order, there is no conceivable way to redress the wrong without overturning the order of a state court. *Rooker-Feldman* does not permit such an outcome.'" *Jakupovic*, 850 F.3d at 903, quoting *Sykes*, 837 F.3d at 743. Both the injury and review-and-reject elements are satisfied in such cases.

B.  *Circuit Precedents and Stare Decisis*

The new majority also does not even acknowledge how well-settled our circuit's law has been in rejecting its new rule. After *Exxon Mobil*, we have, until today, consistently rejected the majority's position. We have repeatedly applied *Rooker-Feldman* to claims where federal plaintiffs sought only damages rather than a federal judgment literally vacating or modifying a state-court judgment. We have done so because we have recognized that even when a state-court loser seeks only damages, a federal court is still being invited to review and reject the state-court decision. For our cases making this

point after *Exxon Mobil*, see *Bauer v. Koester*, 951 F.3d 863, 865–66 (7th Cir. 2020) (*Rooker-Feldman* barred claim for damages to remedy injuries inflicted by state-court foreclosure judgment); *Moore v. Wells Fargo Bank, N.A.*, 908 F.3d 1050, 1062 (7th Cir. 2018) (same: "Mr. Moore insists he can bring these claims before us because he seeks damages rather than reconsideration of the state court decision, but that assertion denies the substance of what he actually seeks in federal court."); *Lennon v. City of Carmel*, 865 F.3d 503, 507 (7th Cir. 2018) (*Rooker-Feldman* barred claims for damages from traffic fines and points added to driving records imposed in state-court proceedings); *Harold v. Steel*, 773 F.3d 884, 885–87 (7th Cir. 2014) (*Rooker-Feldman* barred claim for damages under Fair Debt Collection Practices Act where only source of injury was state-court judgment); *Gilbert v. Illinois State Bd. of Educ.*, 591 F.3d 896, 899–902 (7th Cir. 2010) (*Rooker-Feldman* barred claims for damages and injunction where state-court judgment reinstated teacher's termination; affirming district court decision that "*Rooker-Feldman* doctrine barred Gilbert's claims no matter what form of relief he sought"); *Kelley v. Med-1 Solutions, LLC*, 548 F.3d 600, 605 (7th Cir. 2008) (*Rooker-Feldman* barred claims for damages in amounts attorney fees awarded against federal plaintiffs in state-court judgments: "Because defendants needed to prevail in state court in order to capitalize on the alleged fraud, the FDCPA claims that plaintiffs bring ultimately require us to evaluate the state court judgments. We could not determine that defendants' representations and requests relating to attorney fees violated the law without determining that the state court erred by issuing judgments granting the attorney fees.").

Judge Kirsch's opinion says nothing directly about this consistent line of authority, which has not been even

controversial until today's decision. (All the cited cases were unanimous and were joined by, among others, four members of the new six-member majority rejecting them on this point.) Instead, to overcome both *Exxon Mobil* and the weight of our case law on this issue, the opinion relies on two other decisions of this court, *Brokaw v. Weaver*, 305 F.3d 660 (7th Cir. 2002), and *Johnson v. Pushpin Holdings, LLC*, 748 F.3d 769 (7th Cir. 2014). Post at 69–70**.** We found federal jurisdiction in those decisions, but not on the majority's new theory that the plaintiffs had requested only damages.

In *Brokaw*, we wrote that claims based on injuries sustained "before any court proceedings occurred" could proceed because the plaintiffs had no "reasonable opportunity" to pursue them in state court and, alternatively, the claims were "independent[] of the state court decision." 305 F.3d at 664–65, 668. *Brokaw* also said that even if the plaintiffs alleged injuries directly from the state-court judgments, *Rooker-Feldman* did not apply because the plaintiffs had no opportunity to raise their federal issues in the state courts. The case is thus not on point here. It is certainly not a counterweight to the long line of cases rejecting the majority's theory.

*Pushpin Holdings* offers some rhetorical support for the majority in dicta, but a closer look at the facts shows that we did not embrace the majority's theory there. We certainly did not engage with or purport to depart from the many cases rejecting that theory. Plaintiffs in the case had filed a class action in a state court alleging that Pushpin had filed more than 1,000 "fraudulent" small-claims suits in state court that resulted in default judgments against class members. 748 F.3d at 770–71. After Pushpin removed the case to federal court,

the class argued that *Rooker-Feldman* required remand. *Id.* at 773. We rejected application of the doctrine, noting without any analysis that *Rooker-Feldman* "does not bar a federal suit that seeks damages for a fraud that resulted in a judgment adverse" to the federal plaintiff. *Id.*, citing *Nesses v. Shepard*, 68 F.3d 1003, 1004 (7th Cir. 1995), and cases cited in *Truong v. Bank of America, N.A.*, 717 F.3d 377, 383–84 (5th Cir. 2013). *Pushpin*'s language, if not its holding, would thus seem to support not the majority's new rule but a "fraud exception" to *Rooker-Feldman*, which does not exist, as explained below in Part VI, which is a majority en banc decision.

Moreover, our later decision in the *Pushpin* case made this limit clear. We affirmed the district court's dismissal for failure to state a claim. We made clear then that the alleged fraud occurred *prior* to the state-court proceedings. *Johnson v. Pushpin Holdings, LLC*, 821 F.3d 871, 873, 875–76 (7th Cir. 2016) (plaintiffs alleged that defendants violated the state consumer protection law when they failed to register as a debt collection agency, sued for an unconscionably high amount, and forged plaintiffs' signatures on guaranties and leases).

In short, neither *Brokaw* nor *Pushpin* was on point. Neither adopted the majority's new rule that a federal plaintiff can avoid *Rooker-Feldman* by asking only for damages for injuries inflicted by state-court judgments.[7]

---

[7] Likewise, the cases that Judge Kirsch's opinion relies on from other circuits are distinguishable or inconsistent with our circuit's precedents from both before and after *Exxon Mobil*. See *Hohenberg v. Shelby County*, 68 F.4th 336 (6th Cir. 2023); *Behr v. Campbell,* 8 F.4th 1206 (11th Cir. 2021); *Webb ex rel. K.S. v. Smith*, 936 F.3d 808 (8th Cir. 2019); *Great Western Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159 (3d Cir. 2010); *Kovacic v. Cuyahoga County Dep't of Children & Family Servs.*, 606 F.3d 301 (6th Cir.

Under these circumstances, I need not say anything original here about the familiar principle of stare decisis:

> Overruling precedent is never a small matter. Stare decisis—in English, the idea that today's Court should stand by yesterday's decisions—is "a foundation stone of the rule of law." *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 798 (2014). Application of that doctrine, although "not an inexorable command," is the "preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne v. Tennessee*, 501 U.S. 808, 827–828 (1991). It also reduces incentives for challenging settled precedents,

---

2010); *Green v. Mattingly*, 585 F.3d 97 (2d Cir. 2009); *Adkins v. Rumsfeld*, 464 F.3d 456 (4th Cir. 2006); *Mo's Express, LLC v. Sopkin*, 441 F.3d 1229 (10th Cir. 2006); *Holloway v. Brush*, 220 F.3d 767 (6th Cir. 2000) (en banc); *Ernst v. Child & Youth Servs. of Chester County*, 108 F.3d 486 (3d Cir. 1997). In all but one of these cases, plaintiff argues, damages requests went forward in federal court, but not because plaintiffs were seeking only damages. The exception is *Behr*, where a father lost custody of two of his four children in state court. Along with his other two children, he sued a host of defendants in federal court for conspiring to deprive him of custody. 8 F.4th at 1208–09. The Eleventh Circuit reversed dismissal of some claims, adopting the majority's theory here that a request for damages for injuries caused by a state court's unconstitutional judgment does not ask a federal court to "review and reject" that judgment. That approach is contrary to our circuit's long line of precedents before and after *Exxon Mobil*.

saving parties and courts the expense of endless
relitigation.

*Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 455 (2015).
Or, as this court put it a few years earlier:

> if the fact that a court considers one of its previ-
> ous decisions to be incorrect is a sufficient
> ground for overruling it, then stare decisis is out
> the window, because no doctrine of deference to
> precedent is needed to induce a court to follow
> the precedents that it agrees with; a court has no
> incentive to overrule them even if it is com-
> pletely free to do so. The doctrine of stare decisis
> imparts authority to a decision, depending on
> the court that rendered it, merely by virtue of
> the authority of the rendering court and inde-
> pendently of the quality of its reasoning. The es-
> sence of stare decisis is that the mere existence
> of certain decisions becomes a reason for adher-
> ing to their holdings in subsequent cases.

*Tate v. Showboat Marina Casino P'ship*, 431 F.3d 580, 582–83 (7th
Cir. 2005) (citation and internal quotation marks omitted).

I agree that stare decisis is not "an inexorable command,"
but one can reasonably expect the majority (a) to acknowledge
what it is doing to circuit precedent and (b) to offer some com-
pelling justification for doing so beyond disagreement with
those precedents. The majority here does neither. It does not
rely on any intervening Supreme Court precedent or statutory
amendment. Nor does it assert that our established *Rooker-
Feldman* precedents have been causing active mischief and
harm. To the contrary, Judge Kirsch's opinion goes out of its

way to assert that the majority's new course under *Rooker-Feldman* will have little or no practical impact. The theory (or hope) seems to be that all the plaintiffs whose cases will now be subject to federal jurisdiction will still lose on the merits based on immunity doctrines and claim and issue preclusion. Perhaps, but if that's what the majority expects, what's the point of overruling our post-*Exxon Mobil* precedents applying *Rooker-Feldman* to damages claims?

C. *Arbitrary, Impractical, and to What End?*

None of this adds up to a persuasive case for overruling well-established circuit precedents. To the contrary, the more likely results will be arbitrary, inconsistent, and impractical. We will add to the cost and delays of efforts to relitigate child custody, mortgage foreclosures, and other disputes that seem especially prone to stubborn relitigation.

*Rooker-Feldman* has arisen most often in child-custody cases and mortgage foreclosures. The federal plaintiffs in such cases are often pro se, since lawyers are more likely than pro se parties to anticipate the obstacles they will face in going to federal court to challenge a state-court decision. With or without counsel, these state-court losers will now be able to establish federal jurisdiction in the district courts to pursue their claims. Further, consider how often state courts issue temporary restraining orders and preliminary injunctions that cause significant injury to the enjoined party. (Erroneous enforcement of unreasonable and oppressive covenants not to compete—especially with ex parte injunctions—comes to mind.)

This case is about a family-law matter, child custody. The high stakes and strong emotions in such matters are obvious.

They provide powerful motives to treat a state-court loss as not final, as reflected in the frequency of such cases on our docket, especially with pro se plaintiffs. We also see frequent efforts to continue litigating state-court losses in federal challenges to foreclosures on home mortgages. Under the majority's new rule, federal courts will now have jurisdiction over claims for damages based on alleged due process violations in state-court foreclosure proceedings. We can expect to see even more such challenges. And by categorically excluding damages claims from *Rooker-Feldman*, the majority is also inviting federal challenges to state-court decisions granting temporary restraining orders and preliminary injunctions that inflict injury on the enjoined parties.

It may be that absolute judicial immunity will protect some defendants at the motion-to-dismiss stage—most likely state-court judges and those carrying out their orders. Other defendants will not have that option, particularly in child-custody and mortgage-foreclosure cases. More fundamental, the majority is overlooking important practical differences between resolving a case based on the *Rooker-Feldman* jurisdictional doctrine and relying instead on preclusion and immunity doctrines.

The most important difference is that doctrines of claim preclusion and issue preclusion (also known as res judicata and collateral estoppel) are equitable doctrines. They are subject to equitable exceptions and significant state-to-state variation. In Illinois, for example, claim preclusion "is an equitable doctrine that is not applied when it is fundamentally unfair to do so." *Parker v. Lyons*, 757 F.3d 701, 706 (7th Cir. 2014) (internal quotation omitted), overruled on other grounds by *Hadzi-Tanovic v. Johnson*, 62 F.4th 394 (7th Cir. 2023). We have

said that in Wisconsin, on the other hand, while "the doctrine of issue preclusion includes a 'fairness' element, claim preclusion does not. The Wisconsin Supreme Court has not adopted a general fairness factor as part of its claim-preclusion doctrine." *Adams Outdoor Advert. Ltd. P'ship v. City of Madison*, 56 F.4th 1111, 1118 (7th Cir. 2023), citing *Kruckenberg v. Harvey*, 279 Wis. 2d 520, 541–42, 694 N.W.2d 879, 890. But cf. *Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist.*, 382 F.3d 743, 765 & n. 17 (7th Cir. 2004) (remanding for consideration of Wisconsin "fairness" exception to claim preclusion: "[c]laim preclusion may be disregarded in appropriate circumstances when the policies favoring preclusion of a second action are trumped by other significant policies. Claim preclusion ... is a principle of public policy applied to render justice, not to deny it. Any exception to claim preclusion, however, must be limited to special circumstances or the exceptions will weaken the values of repose and reliance."), quoting *Sopha v. Owens-Corning Fiberglas Corp.*, 230 Wis.2d 212, 236, 601 N.W.2d 627, 638 (1999).

When it comes to issue preclusion based on Wisconsin state court decisions, the "fundamental fairness step" requires the court to "determine whether it is fundamentally fair to employ issue preclusion given the circumstances of the particular case at hand." *First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 773 (7th Cir. 2013), quoting *Mrozek v. Intra Fin. Corp.*, 281 Wis.2d 448, 464, 699 N.W.2d 54, 61 (2005). Relevant factors include "the availability of review of the first judgment, differences in the quality or extensiveness of the proceedings, shifts in the burden of persuasion, and the adequacy of the loser's incentive to obtain a full and fair adjudication of the issue." *Id.* And signaling the need for caution here, especially before the majority relies too heavily on these doctrines, we said that

Wisconsin's "fundamental fairness step eschews formalistic requirements in favor of 'a looser, equities-based interpretation of the doctrine.'" *Id.*, quoting *Michelle T. by Sumpter v. Crozier*, 173 Wis.2d 681, 688, 495 N.W.2d 327, 330 (1993).

For these reasons, this circuit's precedents under *Rooker-Feldman* offer a much better prospect for preventing unjustified relitigation of state-court judgments than the looser equitable evaluations permitted or required under doctrines of claim and issue preclusion, upon which the majority places so much reliance.[8]

As for immunity doctrines, absolute judicial immunity should protect judges and those who are carrying out their commands. Other federal defendants, including the state-court plaintiffs and their agents (such as the social workers here) will probably have to fend for themselves without absolute immunity. Qualified immunity may help them in some cases, but not at the pleading stage if the federal plaintiff accuses them of misleading the state courts. Use of these other doctrines seems to me likely to lead to longer and more extensive litigation seeking federal review and rejection of state-court judgments.

---

[8] Judge Kirsch asserts that the *Rooker-Feldman* doctrine, as it existed prior to this decision and advocated in this opinion, federalized issue and claim preclusion. Post at 79**.** That description is not accurate. *Rooker-Feldman* and preclusion are not jigsaw puzzle pieces, where one cannot sit atop the other. The doctrines can and do overlap when a state-court loser asks a federal court to review and reject a state-court decision *and* to decide issues or claims that were previously resolved on their merits. In these common instances, the jurisdictional nature of *Rooker-Feldman* simply means that it must be decided first.

Consider what discovery and a trial would look like in this case or similar child-custody cases, or in mortgage-foreclosure cases. To award the damages this plaintiff seeks on these four claims, the federal court (and probably a jury) would need to put the Wisconsin trial court's proceedings under a microscope. The federal trial would need to focus on the evidence before the state court, its weight and credibility, and even which factual and legal arguments were presented to the state court. A jury simply could not rule in favor of plaintiff on any of these claims without finding that the state court's judgments about custody of T.E.H. were wrong on the merits.

The merits of plaintiff's claims here also pose obvious questions of causation, particularly given the evidence of her habitual methamphetamine abuse. It is easy to imagine a defendant in this federal case seeking to call as a witness the state-court judge to explain whether particular evidence, especially allegedly false evidence, did or did not make a difference in the state-court decisions that injured the plaintiff. Perhaps such questions of materiality could be decided fairly without such testimony, but perhaps not. Consider the predicament of a county social worker. Her job is to try to protect vulnerable children from neglect and abuse. She faces a federal jury trial where the plaintiff seeks compensatory and punitive damage sufficient to bankrupt her. She would be entitled to offer evidence showing that, even if she presented an incomplete and incorrect picture of the case to the state court, the errors would not have made any difference because the mother was in denial about a serious methamphetamine addiction.

Trying the four claims presented here would inevitably invite review and rejection of the state court's judgments. The friction between state and federal courts would only increase. Judge Kirsch dismisses these concerns about federal-state friction as overridden by his view of the scope of our obligatory jurisdiction. Post at 75**.** The same response might be made to many fundamental doctrines of federalism, including different varieties of abstention and some applications of ripeness, mootness, and standing. All of those doctrines can keep federal courts from ruling on the merits of cases otherwise within their jurisdiction. The majority's dismissal of these concerns also stands in sharp contrast to federal courts' reactions to litigants' attempts to avoid the effects of *federal*-court judgments by seeking relief in *state* courts. Those reactions have a distinctly practical side to them that is missing in the majority's decisive reliance on the form of relief sought in the second action.

For example, in *Matter of VMS Securities Litigation*, 103 F.3d 1317 (7th Cir. 1996), overruled in part on other ground by *Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983 (7th Cir. 2010), a federal district court approved a class settlement of securities law claims. A group of class members who had not opted out were unhappy with the settlement. Rather than appeal in the federal courts, they brought a new claim for damages in a state court. We affirmed an injunction against that state-court litigation, and we held that the All Writs Act, 28 U.S.C. § 1651, permitted the injunction and that the Anti-Injunction Act, 28 U.S.C. § 2283, did not apply, because the federal court was protecting its jurisdiction. 103 F.3d at 1324–25 (collecting cases). The state court was not being asked to, in the majority's words here, "reverse" the federal judgment, but it was being asked to award damages for injuries inflicted

by it. That would have required the state court to "review and reject" the federal judgment. Accord, e.g., *Wyly v. Weiss*, 697 F.3d 131, 139–45 (2d Cir. 2012) (district court that had approved attorney fees as part of class settlement properly enjoined class members' state court case seeking damages from attorneys based on alleged legal malpractice); *Rutledge v. Scott Chotin, Inc.*, 972 F.2d 820, 824–25 (7th Cir. 1992) (affirming federal injunction against state court action for damages contrary to federal decision on statute of limitations defense). Or consider how the federal courts would react to a state court action for damages brought against federal plaintiffs who had obtained a federal injunction against potentially violent interference with the federal plaintiffs' planned march in favor of civil rights (or any other cause, for that matter).

With this comparison, I am not suggesting that a state court would have any business trying to enjoin this federal litigation. But the federal courts' pragmatic applications of 28 U.S.C. §§ 1651 and 2283 to prevent state courts from "reviewing and rejecting" federal judgments by awarding damages for injuries inflicted by them are hard to reconcile with the majority's formalism. The majority's dismissal of concerns about friction between state and federal courts is also difficult to reconcile with federal courts' approaches when the positions are reversed.

To sum up the grounds for this dissent from the majority's new decision not to apply *Rooker-Feldman* if the federal plaintiff seeks only damages for injuries inflicted by state-court judgments, the majority's new rule: (A) is not required by the Supreme Court's opinion in *Exxon Mobil*, which signaled a more practical approach; (B) overrules a long and consistent line of precedent from this court, and does so without

acknowledging or justifying its action; and (C) is likely to add new layers of expense, confusion, and complexity in categories of cases where parties refuse to accept their losses in state courts.

Before moving on, I must acknowledge that Judge Kirsch's opinion denies that it is actually adopting the bright-line rule that I read in it. The opinion suggests in a curious dictum that *Rooker-Feldman* might bar a federal claim for damages where the challenged state-court judgment awarded damages. Post at 74**.** The theory seems to be that a federal damages award "would nullify or modify" the state-court judgment. To the contrary, such an award on the majority's theory would not "modify" a state-court judgment at all. Such an award would "nullify" a state-court judgment awarding damages only under the more practical approach to the "review and reject" element of *Exxon Mobil* advocated in this opinion.

In other words, that concession undercuts the foundation of the new majority rule. The concession is built on the premise that "review and reject" must mean something broader than directly vacating a state-court judgment. Still, apart from exposing the contradiction in the majority position, the concession also seems unlikely to have much practical effect. Such cases seeking damages in a federal court to undo or offset damages awarded by a state court seem to be rare. Only one such actual case is cited, *Bauer v. Koester*, 951 F.3d 863 (7th Cir. 2020), and we affirmed a *Rooker-Feldman* dismissal there under longstanding principles the new majority rejects here.

V.  *Opportunity to Raise Federal Issues in State Court*

This Part V is the opinion of an en banc majority. In opposing application of the *Rooker-Feldman* doctrine, plaintiff also

argues that she had no reasonable opportunity to raise her claims in state court.

Even if a claim otherwise seems barred by *Rooker-Feldman*, this court has recognized a narrow exception to the doctrine: "if a plaintiff lacked a reasonable opportunity to litigate" an issue in state court, then the claim may proceed in federal court. *Kelley*, 548 F.3d at 605; see also *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 558 (7th Cir. 1999), citing *Wood v. Orange County*, 715 F.2d 1543, 1547 (11th Cir. 1983). The "reasonable opportunity" exception operates as something of a safety valve with respect to the review-and-reject element, allowing a claim to go forward where "factors independent of the actions of the opposing parties," such as state-court procedural barriers, prevented the plaintiff from asserting her rights in state court. *Jakupovic*, 850 F.3d at 904, quoting *Taylor v. Federal Nat'l Mortg. Ass'n*, 374 F.3d 529, 534–35 (7th Cir. 2004) (cleaned up). Essentially, if an issue could not have been raised in the state court, the state court's judgment could not have encompassed that issue, and we could not review and reject that judgment by deciding it.

We have carefully limited the "reasonable opportunity" safety valve lest the exception swallow the rule. "Reasonable opportunities" are not only those available "in the particular state court" that rendered the judgment adverse to the federal plaintiff. *Kelley*, 548 F.3d at 606 (finding a "reasonable opportunity" where plaintiff could have transferred "small claims cases to the plenary docket for trial by jury"); see also *Beth-El All Nations Church v. City of Chicago*, 486 F.3d 286, 292–93 (7th Cir. 2007) (state-court judgment could have been "attacked at any time"). Rather, state law must "have effectively precluded" raising the issue in state court for the federal plaintiff

to succeed on a "no reasonable opportunity" argument. *Long*, 182 F.3d at 558–59.

Only twice have we found the federal plaintiff had no "reasonable opportunity" to raise the federal issue in state court. One was *Long*, where the state-court "forcible entry and detainer" proceedings were summary in nature, so that Long's federal issues could not be heard. *Id.* at 559–60. The other was *Brokaw*, where the plaintiff was not "even present" at a hearing "and was not represented … by a guardian ad litem or an attorney." 305 F.3d at 668.

The situation here was quite different. *Brokaw* is easily distinguishable because Gilbank was represented in state court by an attorney, and T.E.H. was represented by a guardian ad litem. *Long* is distinguishable because Gilbank had ample opportunities to raise her federal issues, and actually did raise them.

Gilbank argues that two procedural barriers prevented her from asserting her rights in state court. First, she contends that her constitutional challenges were simply beyond the scope of the custody and placement hearings. She points out that an initial custody hearing is held "to determine whether any party wishes to contest an allegation that the child … is in need of protection or services." Wis. Stat. § 48.30(1). Later hearings also focus on the allegations in the petition and the appropriate placement of the child. See §§ 48.30(7), 48.335 & 48.345.

In fact, however, the Wisconsin Children's Code imposed no limits comparable to those in *Long*. If a party believes that an allegation is fraudulent or that relief would violate a constitutional right, Wisconsin state law gives her the right to

raise the issue in the CHIPS proceedings. The Children's Code instructs that it "shall be liberally construed" so that "children and all other interested parties are assured fair hearings and their constitutional and other legal rights are recognized and enforced." Wis. Stat. § 48.01(1), (1)(ad). More specifically, the Children's Code provides that "[d]efenses and objections based on defects in the institution of proceedings, lack of probable cause on the face of the petition, [or] insufficiency of the petition," as well as motions to suppress evidence and challenges to "the lawfulness of the taking into custody," *must* be raised on penalty of waiver. § 48.297(2)–(4). Just because the focus of proceedings is on a particular issue does not mean that the scope of those proceedings is constrained.

Second, plaintiff contends that "the strict, mandatory timeframes within which various stages of a CHIPS proceeding must take place" precluded her "from effectively raising her claims." The limitations period for her claims under 42 U.S.C. §§ 1983 & 1985 is three years. Wis. Stat. § 893.54(1m)(a). A CHIPS fact-finding hearing must be held within 30 days of the initial hearing. Wis. Stat. § 48.30(7). A date for a dispositional hearing must be set within 30 days of the fact-finding hearing. § 48.31(7)(a). While these consecutive 30-day windows are relatively narrow, they afford far more opportunity to raise a constitutional issue than did the forcible entry and detainer proceeding we considered in *Long*. See 182 F.3d at 552–53 (judgment entered against plaintiff in a single *ex parte* proceeding). Here, during September and October 2018, three hearings were held, hours of testimony were taken, and plaintiff and her counsel were afforded repeated opportunities to raise any challenges or issues they wished. Plaintiff had still more opportunities as hearings continued through September 2019. She also could have appealed and presented her

constitutional challenges as of right following the state court's judgments, or she could have petitioned for permission to appeal during the state-court proceedings. Wis. Stat. § 808.03(1)–(2).

In fact, plaintiff actually raised these issues in state court. Take plaintiff's substantive due process claim. She did not say in so many words that removing her daughter from her custody "is a violation of substantive due process under the United States Constitution," but throughout the proceedings she challenged the relevant officials' alleged interference with family integrity. In her September 5, 2018 motion to dismiss, plaintiff essentially stated a substantive due process violation, asserting "the important and defendable and inalienable rights of a parent and child relationship." That language signaled with sufficient clarity that she was invoking a federal substantive due process right to family integrity.

Plaintiff also repeatedly challenged her lack of notice for the initial temporary physical custody hearing, first sending a letter to the presiding judge, then filing motions to dismiss or reopen those hearings for lack of notice, and finally asking permission to take the issue "to a higher court."

So too with plaintiff's claims that state procedural rules were violated and that officials made fraudulent statements to the state court. Plaintiff challenged the failure to notify her of the initial hearing, in violation of state statutes, in her September 2018 motion to dismiss. And in her February 2019 motion to dismiss, plaintiff raised myriad state-law challenges and her claims of fraud.

We recognize that plaintiff believes the state court decided these and many other issues incorrectly. But again, *Rooker-*

*Feldman* is built on the assumption that a state court has erred in a way that injured the federal plaintiff. See *Rooker*, 263 U.S. at 415–16 ("If the [state-court] decision was wrong, … no court of the United States other than this court could entertain a proceeding to reverse or modify the [state-court] judgment[.]"). And again, there is no *Rooker-Feldman* exception for egregious errors or serious injuries.

If the federal plaintiff actually raised the challenge in state court, there can be no recourse to the "reasonable opportunity" safety valve. As the Supreme Court said in *Rooker*, if the constitutional questions presented to the federal court actually arose in the state-court proceedings, "it was the province and duty of the state courts to decide them," and the injured party's recourse is to "an appropriate and timely appellate proceeding" in the state courts and, if necessary, in the Supreme Court of the United States. 263 U.S. at 415.

VI. *No "Fraud Exception"*

This Part VI is also the opinion of an en banc majority. In opposing application of *Rooker-Feldman*, plaintiff argues that some of the defendants defrauded the state court, lying to the court about her case and thus causing her injuries inflicted by the state-court judgments. Put another way, plaintiff tries to invoke what has sometimes erroneously been called a "fraud exception" to *Rooker-Feldman*'s jurisdictional bar.[9]

---

[9] We have often said in non-precedential orders that "the *Rooker-Feldman* doctrine does not have a fraud exception." *Podemski v. U.S. Bank National Ass'n*, 714 F. App'x 580, 581–82 (7th Cir. 2017), citing *Mains v. Citibank, N.A.*, 852 F.3d 669, 676 (7th Cir. 2017), and *Kelley*, 548 F.3d at 605; see also *Keith v. Wisconsin Dep't of Workforce Dev.*, No. 21-2398, 2022 WL 741731, at *2 (7th Cir. Mar. 11, 2022) ("[T]here is no general fraud exception to *Rooker-Feldman*."), citing *Iqbal*, 780 F.3d at 729; *Bond v. Perley*, 705 F.

We recently explained in *Hadzi-Tanovic v. Johnson*, 62 F.4th 394, 396 (7th Cir. 2023), that *Rooker-Feldman* applies even where the federal plaintiff alleges that the state courts that injured her were corrupt. We did not address in *Hadzi-Tanovic* the related issue whether *Rooker-Feldman* applies "where plaintiffs seek damages for injuries caused … by the fraudulent conduct of state court opponents." *Id.* at 406. That question is before us in this case. Plaintiff argues that two of our prior decisions—the same *Brokaw* case we just discussed, *Brokaw v. Weaver*, 305 F.3d 660 (7th Cir. 2002), and *Johnson v. Pushpin Holdings, LLC*, 748 F.3d 769 (7th Cir. 2014)—recognize a "fraud" exception to *Rooker-Feldman*. The great weight of our case law, however, unequivocally holds the opposite, and a closer look at *Brokaw* and *Pushpin* shows they offer little actual support for such an exception.

The notion of a "fraud exception" to *Rooker-Feldman* seems to have germinated in *Nesses v. Shepard*, 68 F.3d 1003 (7th Cir. 1995), a case that we recently overruled in part in *Hadzi-Tanovic*. In *Nesses*, the federal plaintiff "alleged 'a massive, tentacular conspiracy' by the defendants to 'engineer' his defeat in state court." *Hadzi-Tanovic*, 62 F.4th at 402, quoting *Nesses*, 68 F.3d at 1004. We acknowledged that the plaintiff could not "show injury from the alleged conspiracy unless" the state-court decision "was erroneous," but we concluded that there was jurisdiction so long as the plaintiff claimed that "people involved in the [state-court] decision violated some

---

App'x 464, 465 (7th Cir. 2017) ("[W]e have rejected the notion of a 'fraud exception' to *Rooker-Feldman*."), citing *Iqbal*, 780 F.3d at 729; accord *Truong v. Bank of America, N.A.*, 717 F.3d 377, 383 n.3 (5th Cir. 2013) ("There is, of course, no general rule that *any* claim that relies on a fraud allegation is an 'independent claim' for *Rooker-Feldman* purposes.").

independent right of his, such as the right (if it is a right) to be judged by a tribunal that is uncontaminated by politics." *Nesses*, 68 F.3d at 1005. If *Rooker-Feldman* barred the claim, we reasoned, "there would be no federal remedy for a violation of federal rights whenever the violator so far succeeded in corrupting the state judicial process as to obtain a favorable judgment." *Id.*

We later applied this same reasoning in two other cases involving allegations of extensive judicial corruption—*Loubser v. Thacker*, 440 F.3d 439 (7th Cir. 2006), and *Parker v. Lyons*, 757 F.3d 701 (7th Cir. 2014). *Hadzi-Tanovic* overruled these cases as well, putting an end to the "corruption exception." 62 F.4th at 402. But *Hadzi-Tanovic* expressly left open the status of a fraud exception, noting the tension in this circuit's case law on that subject. *Id.* at 406–07. We noted there that two of our opinions have been read to extend *Nesses*' reasoning from claims of "judicial corruption" to claims of "third-party fraud." We explain here why that reading is mistaken.

In *Brokaw v. Weaver*, decided before *Exxon Mobil*, the federal plaintiff brought claims for violations of procedural and substantive due process and the Fourth Amendment, alleging "that the defendants conspired with state actors to file false claims of child neglect so as to cause her and her brother to be removed from their parents' home." 305 F.3d at 669–70. Without prior judicial authorization, state actors had removed the children from the home, so both the conspiracy and the removal were effectuated "prior to any judicial involvement." *Id.* at 662–63, 665. About a month later, a state judge adjudicated the children wards of the state. *Id.* at 662–63. We concluded "that the *Nesses* reasoning" applied because the federal plaintiff was "not merely claiming that the [subsequent]

decision of the state court was incorrect or that the decision violated her constitutional rights," but that "the people involved in the decision to forcibly remove her from her home" violated her rights "independently of the state court decision." *Id.* at 665. Given that the alleged Fourth Amendment and due process violations occurred "before any court proceedings occurred," *id.* at 664, *Brokaw*'s conclusion on that point was correct. As explained above, we reach the same conclusion here on Gilbank's Fourth Amendment and substantive due process claims insofar as they are based on injuries allegedly sustained before any action by the state court.

In discussing *Nesses*, however, the *Brokaw* opinion observed that some of *Nesses*' language "indicates that, even if [plaintiff] would not have suffered any damages absent the state order of wardship, her claim is not barred by the *Rooker-Feldman* doctrine …." *Id.* at 667. This was not *Brokaw*'s holding but merely a response to an argument by the defendants. It was not essential to *Brokaw*'s holding because the federal plaintiff had suffered an injury independent of the state-court judgment. Indeed, *Brokaw* went on to observe that this language from *Nesses* was in direct conflict with language from *Long*: "because '[a]bsent the eviction order, [plaintiff] would not have suffered the injuries for which she now seeks to be compensated,' her claims appeared to be barred under *Rooker-Feldman*." *Id.*, quoting *Long*, 182 F.3d at 557. *Brokaw* found that *Long*'s "reasoning seemingly support[ed] the defendants' argument that" the *Brokaw* plaintiff's claims were barred by *Rooker-Feldman*. *Id.*

*Brokaw* therefore did not find jurisdiction solely or even partially on a theory that an allegation that the defendants had misled or defrauded the state court made the claims

"independent" of the state-court judgment. Rather, we took a belt-and-suspenders approach to jurisdiction, concluding that, "even assuming that [the] constitutional claims [were] not independent of the state court proceedings," they were not barred by *Rooker-Feldman* because plaintiff, who was neither present at the wardship hearing nor represented by a guardian ad litem, "lacked a reasonable opportunity to present" her claims in state court. *Id.* at 668. Thus, although *Brokaw* has been cited as creating a "fraud exception" to *Rooker-Feldman*, the case provides only tenuous support for it.

Our opinion in *Johnson v. Pushpin Holdings, LLC* also cited *Nesses* for the proposition that there is a "fraud exception" to *Rooker-Feldman*. In *Pushpin*, plaintiffs filed a class action in Illinois state court, alleging that Pushpin had filed more than 1,000 "fraudulent" small-claims suits in state court that resulted in default judgments against class members. 748 F.3d at 770–71. After Pushpin removed to federal court, the class argued that *Rooker-Feldman* required remand. *Id.* at 773. We rejected application of the doctrine, noting without any analysis that *Rooker-Feldman* "does not bar a federal suit that seeks damages for a fraud that resulted in a judgment adverse" to the federal plaintiff. *Id.*, citing *Nesses*, 68 F.3d at 1004, and cases cited in *Truong v. Bank of America, N.A.*, 717 F.3d 377, 383–84 (5th Cir. 2013). *Pushpin*'s language, if not its holding, would thus seem to support a "fraud exception" to *Rooker-Feldman*. Our later decision in that case affirmed the district court's dismissal for failure to state a claim. We made clear then that the alleged fraud occurred prior to the state-court proceedings. *Pushpin Holdings*, 821 F.3d at 873, 875–76 (plaintiffs alleged that defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act when they failed to register as a debt collection agency, sued for an

unconscionably high amount, and forged plaintiffs' signatures on guaranties and leases).

While some of *Pushpin*'s language endorses a "fraud exception," the case as a whole does not support it. Fraud was not committed during the state-court proceedings; rather, alleged fraud external to those proceedings formed the basis of the state-court actions. The same was true in *Brokaw*, where the alleged fraud occurred "prior to any judicial involvement." 305 F.3d at 665. In short, on closer scrutiny, neither *Brokaw* nor *Pushpin* offers robust support for the "fraud exception" attributed to them.[10]

---

[10] Judge Kirsch's opinion mistakes dicta in *Brokaw* and *Pushpin* for precedential holdings. See post at 69–70. The holdings of both cases remain viable, but their language supporting a fraud exception does not. Other circuits have also, at times, excluded fraud claims from *Rooker-Feldman*. See, e.g., *Behr*, 8 F.4th at 1213 (claims that defendants had violated procedural due process rights by using "falsified and/or coerced information as a basis for the [state-court] proceedings" could proceed because the claims did not seek "to undo the state court's child custody decision"); *Benavidez v. County of San Diego*, 993 F.3d 1134, 1143 (9th Cir. 2021) ("injury based on the alleged misrepresentation by [defendants] that caused the juvenile court to issue" its orders meant that claim was "not a de facto appeal" of those orders); *Truong*, 717 F.3d at 383–84 (relying in part on *Nesses* to find allegations that defendants "misled the state court" and "misled [the plaintiff] into [forgoing] her opportunity" to raise a dispute in state court presented "independent claims"); *McCormick v. Braverman*, 451 F.3d 382, 392 (6th Cir. 2006) (plaintiff's claims that state-court judgments "were procured by certain Defendants through fraud, misrepresentation, or other improper means" did not "assert an injury caused by" those judgments). But some of these decisions seem to hinge not on the existence of a fraud exception but on the court's conclusion that either *Exxon Mobil*'s "injury" element or "review and reject" element was not met in the first place. E.g., *Behr*, 8 F.4th at 1213 (plaintiffs "are not raising these due process claims so that we can 'review and reject' the state court's

To the extent they offer any traction for a "fraud exception," *Brokaw* and *Pushpin* are inconsistent with the great weight of Seventh Circuit case law, including decisions after *Exxon Mobil*. Just a year after *Brokaw*, we held that *Rooker-Feldman* barred claims where the federal plaintiffs alleged that a debt collector had misrepresented the amount of damages recoverable in state court. *Epps v. Creditnet, Inc.*, 320 F.3d 756, 757–60 (7th Cir. 2003). Those claims could not proceed in federal court because they asked the federal courts "to review the state court judgment," and the plaintiffs were not injured "until the state court entered judgment against them." *Id.* at 759.

In *Kelley*, decided after *Exxon Mobil*, we held that *Rooker-Feldman* barred jurisdiction over claims where the "defendants needed to prevail in state court in order to capitalize on [their] alleged fraud." 548 F.3d at 605. Such claims would "ultimately require us to evaluate the state court judgments," for we "could not determine that defendants' representations and requests" in state court were fraudulent "without determining that the state court erred by issuing [its] judgments." *Id.*

---

child custody judgment"); *Truong*, 717 F.3d at 383 (claims "independent" because they sought damages "for injuries caused by the [defendants'] actions, not injuries arising from" the state-court judgment). Other cases on which plaintiff relies to support a "fraud exception" are not persuasive because allegations of fraud, while involved, were not relevant to the court's reasoning. See, e.g., *VanderKodde*, 951 F.3d at 400–01, 403 (while federal defendants had incorrectly, and perhaps fraudulently, calculated post-judgment interest owed by state-court losers, that challenged conduct did not lead to, but *followed*, the state-court judgment).

So too in *Harold*, where the federal plaintiff argued that "false statements" made by his state-court opponent, "rather than the state court's decision, inflicted the injury" underlying his claims. 773 F.3d at 886. We recognized the possibility of "situations in which a violation of federal law" in state court "could cause a loss independent of the suit's outcome." *Id.* For example, debt collectors could violate the Fair Debt Collection Practices Act by filing suit in a prohibited venue. Cf. *Suesz v. Med-1 Solutions, LLC*, 757 F.3d 636 (7th Cir. 2014) (en banc). In such a case, the violation "inflicts an injury measured by the costs of travelling or sending a lawyer to the remote court and moving for a change of venue, no matter how the suit comes out." *Harold*, 773 F.3d at 886. But we concluded in *Harold* that, where the federal plaintiff alleges false "representations that concern the merits" of the state-court litigation, no "injury occurred until the state judge ruled against" the federal plaintiff. *Id. Rooker-Feldman* barred the claims.

In *Mains v. Citibank, N.A.*, 852 F.3d 669 (7th Cir. 2017), we made this point crystal clear. The federal plaintiff argued that a state-court foreclosure judgment was erroneous because it rested on a fraud perpetrated by the defendants. We said that such a claim presented "precisely what *Rooker-Feldman* prohibits." *Id.* at 676. "If we were to delve into the question whether fraud tainted the state court's judgment, the only relief we could give would be to vacate that judgment. That would amount to an exercise of *de facto* appellate jurisdiction …." *Id.* A federal forum would simply be unnecessary because the "state's courts are quite capable of protecting their own integrity." *Id.* To avoid *Rooker-Feldman*, the plaintiff

would need to pursue "damages for independently unlawful conduct." *Id.* at 675.[11]

More recently in *Swartz*, we again rejected the theory that allegations of "false claims" and "bad faith actions" on the part of the state-court opponents take a case outside *Rooker-Feldman*. 940 F.3d at 391–92. Relying on *Kelley*, *Harold*, and *Mains*, we noted that such claims are "routinely dismissed under *Rooker-Feldman*." *Id.* at 392. "To find that the defendants acted wrongfully in seizing the [property at issue] would call into question the state court's judgment," which had ordered the seizure. *Id.* at 391.

Most recently, in *Bauer*, the federal plaintiffs sought damages for the defendants' alleged "collusion to introduce forged evidence" in state-court foreclosure proceedings. 951 F.3d at 866. We held that *Rooker-Feldman* barred the suit "because any finding in favor of the [plaintiffs] would require us to contradict the state court's orders." *Id.* Pointing to *Kelley* and *Swartz*, we emphasized that, "were it not for the state court's foreclosure order and order awarding additional interest, no injury would have resulted from the allegedly forged escrow exhibit or the citations to discover assets. Indeed, the defendants needed to prevail in the state court to effectuate their alleged fraud." *Id.*

---

[11] We also pointed out that Indiana courts allow "a party to file for relief from judgment based on … the fraud or misrepresentation of an adverse party." *Mains*, 852 F.3d at 676. So too in Wisconsin, where a plaintiff like Gilbank may move for relief from a judgment or order based on the alleged "[f]raud, misrepresentation, or other misconduct of an adverse party." Wis. Stat. § 806.07(1)(c) ("Relief from judgment or order"). See also *Matter of Lisse*, 921 F.3d 629, 641 (7th Cir. 2019). The same is true in Illinois. See 735 Ill. Comp. Stat. 5/2-1401.

To be clear, we are not disagreeing with the results in *Brokaw* and *Pushpin*. *Brokaw* correctly allowed the claims to proceed under the "reasonable opportunity" safety valve. The alleged injuries in *Pushpin* occurred before the state-court proceedings began, so those claims also were not barred by *Rooker-Feldman*. The facts of those cases did not call for recognition of a "fraud exception." But we are disapproving the language in *Brokaw* and *Pushpin* that endorses an exception to *Rooker-Feldman* based on a federal plaintiff's allegation that her state-court opponents or others misled or defrauded the state court into causing her injury.

We said in *Hadzi-Tanovic* that failing to apply *Rooker-Feldman* where claims allege injuries based on state-court corruption would "open a large loophole" in the doctrine, one that "has not been endorsed by the Supreme Court." 62 F.4th at 401–02. The same is true with a so-called "fraud exception." The Supreme Court has never suggested that *Rooker-Feldman* does not apply to claims that sound in fraud. If a state-court loser can challenge a state-court judgment in federal court merely by alleging fraud, that exception could too easily swallow the rule.

As we said in *Iqbal*, *Rooker-Feldman* is simply not concerned "with *why* a state court's judgment might be mistaken." 780 F.3d at 729. While "fraud is one such reason[,] there are many others." *Id.* "The reason a litigant gives for contesting the state court's decision cannot endow a federal district court" with jurisdiction that it does not otherwise have. *Id.* In short, "fraud accusations do not change the calculus." *Matter of Lisse*, 921 F.3d 629, 641 (7th Cir. 2019).

VII.     *The Effect of Heck v. Humphrey*

Judge Easterbrook's separate opinion argues for a different reason for dismissal of the four claims that the judges joining this opinion find barred by *Rooker-Feldman*. He treats those claims for injuries inflicted by state-court judgments as not yet having accrued, applying the principles underlying *Heck v. Humphrey*, 512 U.S. 477 (1994). Perhaps *Rooker-Feldman* and *Heck* share deep roots that call for further exploration. See the academic articles cited in Judge Easterbrook's opinion, including Stephen I. Vladeck, *The Increasingly Unflagging Obligation: Federal Jurisdiction after Saudi Basic and Anna Nicole*, 42 Tulsa L. Rev. 553 (2007). Nevertheless, the proposed approach would amount to a dramatic and unprecedented expansion of *Heck* beyond cases complaining about the duration of confinement in criminal cases. I am not prepared to take that step.

The petitioner in *Heck* was a state prisoner who sued for damages, alleging that the defendants had violated his constitutional rights and caused his imprisonment. The Supreme Court held that his claims were not yet ripe—had not yet accrued—because he had not shown that his conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by an authorized state tribunal, or called into question by a federal writ of habeas corpus. 512 U.S. at 486–87. The Supreme Court later took a modest step expanding *Heck* to cases seeking damages for the use of invalid prison disciplinary procedures to deprive a prisoner of good-time credits affecting the length of imprisonment. *Edwards v. Balisok*, 520 U.S. 641 (1997).

Nothing on the surface of *Heck* or *Balisok* indicates broader extension of their rule to any other categories of federal cases seeking damages for injuries inflicted by state-court

judgments. Judge Easterbrook asserts, however, that we must now "treat *Heck* as generally applicable to state-court judgments that have not been set aside," post at 63**,** based on this court's decision in *Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020) (en banc). *Savory* decided a question of accrual for purposes of applying the statute of limitations to civil claims for wrongful conviction. We held that the plaintiff's conviction remained intact, and his claims had not accrued, until he was pardoned. *Id.* at 431. We rejected the civil defendants' and the dissenting judge's arguments that Savory's civil claims accrued earlier, when he was released from state custody but while his convictions remained legally intact. *Id.* at 418–19. The dissent in *Savory* argued for the rule proposed by Justice Souter in his *Heck* concurrence. See 947 F.3d at 431–34 (Easterbrook, J., dissenting), endorsing *Heck*, 512 U.S. at 491–503 (Souter, J., concurring in the judgment). *Savory* did not endorse, explicitly or implicitly, an extension of *Heck* to claims like this plaintiff's, which do not have anything to do with a criminal conviction or the length of a criminal sentence. Perhaps the Supreme Court might take such a step in the future, but I do not see a basis for taking such a broad and consequential step at this point.

Regarding *Heck*, I should also address Judge Kirsch's reliance upon it and his suggestion that my view of *Rooker-Feldman* would leave *Heck* with no work to do. Post at 76**.** It's an interesting and creative argument, but it loses sight of history. Lower federal courts have long had an express grant of jurisdiction to review criminal judgments of state courts, in the form of writs of habeas corpus, at least in the wake of *Moore v. Dempsey*, 261 U.S. 86 (1923), *Brown v. Allen*, 344 U.S. 443 (1953), and similar cases, and the enactment of 28 U.S.C. § 2254. *Heck* was of course a response to civil actions seeking

damages under 42 U.S.C. § 1983 for wrongful convictions in state court. *Heck* was tailored to manage the integration of habeas relief and § 1983. To my knowledge there was no suggestion that *Rooker-Feldman* should apply in the context of challenges to criminal convictions. I do not suggest it should be extended there either, given the different heritages of the relevant statutes and the doctrines that have evolved to manage the respective roles of state and federal courts. If the question were squarely presented in a future case, we could deal with it then.

VIII.    *Claims Not Subject to Rooker-Feldman*

The district court granted summary judgment for defendants on the merits of all claims it found were not barred by *Rooker-Feldman*. All members of the court agree and affirm summary judgment for defendants on those claims. This portion of this opinion is for an en banc majority.

A. *Hypothetical Jurisdiction*

Before addressing the merits of those claims, we consider plaintiff's argument on appeal that the district court erred by exercising "hypothetical" jurisdiction over them. The district court was a bit ambiguous with respect to the remaining claims. At one point, the court wrote: "even if I assumed that Gilbank suffered injuries that were not caused by … the state court's decisions, Gilbank has not presented evidence to support any constitutional violations" with respect to "(1) the warrantless urinalysis; (2) the interrogation without an attorney at the police station; and (3) the denial of due process." *Gilbank*, 2021 WL 5865453, at *6. Adding to the room for argument, the final judgment entered under Rule 58 said that the case was "dismissed" without specifying whether the

dismissal was entirely for lack of jurisdiction or partially on the merits and partially for lack of jurisdiction.

Plaintiff reads "even if I assumed" to mean the district court first concluded that it lacked jurisdiction over *all* of plaintiff's claims but then proceeded to discuss the merits of some of those claims, an exercise of "impermissible hypothetical jurisdiction." As plaintiff sees it, our only course is to remand any claims that survive *Rooker-Feldman* to the district court.

We are not persuaded there was such an error here. First, the district court's opinion as a whole shows that the court did not disclaim jurisdiction over all of plaintiff's claims. Summarizing its decision in its introduction, the court wrote:

> Gilbank's primary injury—loss of custody of her daughter—was the result of the state juvenile court decision. For reasons explained in this opinion, this court does not have authority to review state court decisions. … The other injuries about which Gilbank complains—the warrantless urine test, denial of counsel, and denial of due process—were either already addressed by the state juvenile court or are not constitutional violations.

*Gilbank*, 2021 WL 5865453, at *1. That is not the language of hypothetical jurisdiction; it shows the district judge carefully parsed the limits of *Rooker-Feldman*. That is also how the district judge concluded his opinion:

> In sum, most of Gilbank's claims are based on injuries that were either caused by the state juvenile court's decision [i.e., *Rooker-Feldman*

> applied] or were considered and rejected al-
> ready by a state court [i.e., claim and/or issue
> preclusion applied]. This court cannot provide
> Gilbank relief on those claims. Gilbank's other
> claims lack any evidentiary basis [i.e., plaintiff
> loses on the merits]. Defendants are entitled to
> summary judgment.

*Id.* at *7.

Second, on those claims properly before the district court, defendants moved for summary judgment on both the merits and jurisdictional grounds, and plaintiff moved for summary judgment on the merits. Plaintiff therefore argued or had an opportunity to argue the merits of all her claims. Since we have determined that jurisdiction is proper over some claims, we may affirm the district court's grant of summary judgment with respect to those claims on any ground supported by the record so long as plaintiff "had an opportunity to contest the issue." *O'Brien v. Caterpillar Inc.*, 900 F.3d 923, 928 (7th Cir. 2018). All judges of this court agree that we may reach those claims for which there is jurisdiction, and as we explain next, agree to affirm summary judgment on the merits.

B. *The Merits of Remaining Claims*

1. *Unreasonable Search – Urine Sample*

Plaintiff's unreasonable-search claim fails on the merits. Consent negates any claim to an unreasonable search. *United States v. Ahmad*, 21 F.4th 475, 478 (7th Cir. 2021) ("A search authorized by consent is wholly valid."), quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). In proposed findings of fact for summary judgment, plaintiff did not dispute that she

consented to the urinalysis. Her undisputed consent defeats the claim.

2. *Unreasonable Seizure & Violation of Substantive Due Process – Removal of T.E.H.*

Plaintiff's unreasonable-seizure and substantive-due-process claims based on the removal of T.E.H. in the course of her traffic stop and arrest on August 21, 2018 also fail on the merits. On that day, T.E.H. was not seized by the government or by anyone else. Rather, when plaintiff was facing arrest that day, she called Hoyle and asked him to come care for T.E.H. When plaintiff was arrested, it was Hoyle—and not any government actor—who, with plaintiff's consent, removed T.E.H. from the scene. With no seizure or removal by government actors, neither claim can prevail.

3. *Denial of Due Process – Interrogation Without an Attorney*

Plaintiff's Fifth Amendment claim also fails on the undisputed facts. It is true that, once *Miranda* warnings have been given, if the person under interrogation "states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). But it is also true that, even if questioning continues, no violation of the Fifth Amendment occurs unless and until a statement is used in a criminal case against the person interrogated. *Chavez v. Martinez*, 538 U.S. 760, 769 (2003). Plaintiff's statements to Detective Iverson and social worker Heinzen-Janz were never introduced against her in a criminal trial. Her Fifth Amendment right against self-incrimination therefore was not violated. Defendants are entitled to summary judgment on the merits of this claim.

4. *Unreasonable Seizure – Unlawful Eviction*

Plaintiff also claims that she was unreasonably seized when she was evicted from her home on August 21, 2018. Plaintiff waived this argument by failing to develop it beyond saying only that she suffered a "warrantless" and "unlawful eviction." See *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("arguments that have been raised may still be waived on appeal if they are underdeveloped, conclusory, or unsupported by law").

5. *Substantive Due Process Before the Temporary Custody Order*

We have long recognized a substantive due process "right to familial integrity in the context of action by child protective services." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017). That right is subject to limits. The "interests in familial integrity must be weighed against the state's interest in protecting children from harm." *Id.* To interfere lawfully with family integrity, caseworkers must have "'some definite and articulable evidence giving rise to a reasonable suspicion' of past or imminent danger of abuse before they … take a child into protective custody" or otherwise interfere with a family unit. *Xiong v. Wagner*, 700 F.3d 282, 291 (7th Cir. 2012), quoting *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 478 (7th Cir. 2011). "Reasonable suspicion" means that the state actor has "more than a hunch but less than probable cause." *Id.*, quoting *Hernandez*, 657 F.3d at 478. This "reasonable suspicion" standard applies to all of defendants' actions leading up to plaintiff's arrest.

We doubt very much that any of the defendants' investigative conduct alleged by plaintiff amounted to interference

with family integrity. In any event, the undisputed facts show that defendants' conduct before the state-court proceedings began was justified. When Detective Iverson and social worker Heinzen-Janz performed a welfare check at Hoyle's apartment on June 29, 2018, they did so based on the report of an anonymous caller that Gilbank and T.E.H. appeared to be living in Hoyle's garage during hot summer weather. When they returned to Hoyle's apartment on July 3, it was at plaintiff's request. When they asked plaintiff to provide a urine sample, they knew that she had a pending charge for methamphetamine possession and a history of drug abuse, which she acknowledged. And when they encountered plaintiff on August 21, she had just been arrested for possession of methamphetamine. Even if these actions could be construed as "interference" with family integrity, defendants never acted without consent or reasonable suspicion or both. The substantive due process claim based on defendants' conduct leading up to plaintiff's arrest therefore fails.

### 6.  *Conspiracy Under 42 U.S.C. § 1985*

Section 1985(3) of Title 42 of the United States Code "provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Great American Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979). Without a viable claim for an underlying constitutional or federal statutory violation, plaintiff's Section 1985 conspiracy claim fails as a matter of law.

### 7.  *Monell Claim Against the Marshfield Police Department*

Similarly, to succeed on a *Monell* claim seeking to hold Marshfield liable for constitutional violations by individual

officers, the plaintiff must show the deprivation of a federal right. *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022), citing *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Plaintiff's *Monell* claim cannot survive summary judgment in the absence of an underlying violation of federal law.

## *Conclusion*

Federal jurisdiction is proper over plaintiff's claims based on alleged injuries that were complete before the state-court proceedings began, and on those claims we affirm summary judgment on the merits for the defendants. On plaintiff's claims alleging injuries inflicted by the state-court judgments, dismissal is also affirmed for the reasons set forth in Parts I–III and V–VIII of this opinion and Judge Easterbrook's opinion.

AFFIRMED.

EASTERBROOK, *Circuit Judge*, concurring in the judgment. I agree with Judge Hamilton that the *Rooker-Feldman* doctrine does not have an exception for bad conduct during the state suit. The doctrine rests on the Supreme Court's view that its jurisdiction under 28 U.S.C. §1257 is exclusive, and jurisdictional doctrines do not have equitable exceptions. *Bowles v. Russell*, 551 U.S. 205, 213–14 (2007); *Harrow v. Department of Defense*, 601 U.S. 480, 484 (2024). I join all but Part IV and Part VII of Judge Hamilton's opinion.

But I agree with Judge Kirsch that the *Rooker-Feldman* doctrine does not deprive federal district courts of jurisdiction to award damages for injury caused by a state court's judgment. This is so because damages do not modify a judgment and are not a form of appellate review. I join Part I of Judge Kirsch's opinion.

If this were litigation under state law, in federal court because the parties were of diverse citizenship, I would agree with Judge Kirsch that the suit should be remanded for further proceedings, beginning with consideration of issue and claim preclusion (collateral estoppel and res judicata). But it is not.

All defendants are state actors, and Gilbank's claims rest on 42 U.S.C. §1983. That makes a difference, given the holding of *Heck v. Humphrey*, 512 U.S. 477 (1994), that a federal court must dismiss any suit that seeks damages under §1983 on a theory incompatible with the validity of a state court's judgment that has not been set aside on appeal or by some other means.

The state court's judgment at issue in *Heck* had been entered in a criminal prosecution, but the principle is broader.

*Edwards v. Balisok*, 520 U.S. 641 (1997), holds that the same approach applies when a prisoner contests the outcome of a disciplinary proceeding. And any contention that *Heck* and *Edwards* are limited to persons in custody—in order to coordinate §1983 with 28 U.S.C. §2254, the main provision for collateral review of state criminal judgments—would be inconsistent with *Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020) (en banc). There we held that *Heck* continues to apply even after a prisoner's release and the end of all options to seek collateral review (which is available only to persons in custody). After *Savory*, we must treat *Heck* as generally applicable to state-court judgments that have not been set aside. Once a judgment has been annulled, suit for damages under §1983 is possible; until then, not. The judgment that caused Gilbank's injury has not been vacated. It has been superseded by a later reallocation of custody, but this does not imply that any state tribunal has found it defective.

It is possible to understand *Heck* and its successors as designed to reconcile §1983 with the limits on collateral review under 28 U.S.C. §§ 2254 and 2255. Indeed, I took that view myself in *Savory*. But I was in dissent. 947 F.3d at 431–34. The majority applied *Heck* to a person who had been released from prison years earlier and could not obtain collateral review. It treated *Heck* as instantiating a strong judicial policy against using §1983 to create an outcome inconsistent with a state court's decision. 947 F.3d at 414. *Heck* itself said the same. 512 U.S. at 484. Having extended *Heck* to a situation beyond the reconciliation of damages (§1983) with collateral review (§2254 and §2255), and having treated it as a rule against using §1983 to collect damages on account of a state court's undisturbed decision, we should accept the implications of that choice.

In litigation under §1983, *Heck* and the *Rooker-Feldman* doctrine serve much the same function. Yet the cases that rely on *Heck* do not cite *Rooker* or *Feldman*, and the reverse. (There are a few exceptions, but they say little about how these doctrines relate. See, e.g., *Skinner v. Switzer*, 562 U.S. 521, 531–37 (2011); *Homola v. McNamara*, 59 F.3d 647, 650 (7th Cir. 1995); *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500 (10th Cir. 2023).) Perhaps this is because *Rooker-Feldman* nominally is about jurisdiction, while *Heck* nominally is about ripeness. Yet *Rooker* itself seems to be *Heck*'s progenitor. As the Justices remarked: "If the decision was wrong, that did not make the judgment void, but merely left it open to reversal or modification in an appropriate and timely appellate proceeding. Unless and until so reversed or modified, it would be an effective and conclusive adjudication." *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415 (1923). Although these doctrines have different names, they lead to the same end: as long as the state court's judgment stands, a federal district court must not intervene.

To the extent the overlap of these doctrines has attracted any academic attention (and it has not received much), authors favor treating them as functionally identical. Stephen I. Vladeck, *The Increasingly Unflagging Obligation: Federal Jurisdiction after Saudi Basic and Anna Nicole*, 42 Tulsa L. Rev. 553, 563 (2007) ("[T]he analogy [between *Rooker-Feldman* and] the 'favorable termination' rule of *Heck v. Humphrey* is inescapable—both doctrines purport to limit lawsuits that would require a subsequent court to collaterally invalidate an earlier decision."); Thomas Stephen Schneidau, *Favorable Termination After Freedom: Why Heck's Rule Should Reign, Within Reason*, 70 La. L. Rev. 647, 673–74 (2010) (*Rooker-Feldman*'s bar on appellate review of state court judgments supports applying

*Heck*'s favorable termination rule to "non-habeas-eligible plaintiffs").

I conclude that *Heck* blocks an award of damages in Gilbank's favor. And *Heck* is not her only problem. Defendants who are, or act for, the State of Wisconsin are not "persons" for the purpose of §1983 and cannot be sued for damages. *Will v. Michigan Department of State Police*, 491 U.S. 58 (1989). The judge who entered the custody order has absolute immunity. *Pierson v. Ray*, 386 U.S. 547 (1967); *Stump v. Sparkman*, 435 U.S. 349 (1978). Private parties who conspire with a judge may in principle be liable under 42 U.S.C. §1985, see *Dennis v. Sparks*, 449 U.S. 24 (1980), but people who file civil complaints and their witnesses enjoy absolute immunity under both §1983, see *Briscoe v. LaHue*, 460 U.S. 325 (1983), and state law, see *Restatement (Second) of Torts* §587, for statements during the proceedings. Quite apart from either *Heck* or the *Rooker-Feldman* doctrine, federal courts are not supposed to resolve child-custody disputes. *Ankenbrandt v. Richards*, 504 U.S. 689 (1992); *Ashley W. v. Holcomb*, 34 F.4th 588 (7th Cir. 2022). There is just no point to a remand in this case, so I concur in the judgment.

KIRSCH, *Circuit Judge,* concurring in part and dissenting in part. Michelle Gilbank lost custody of her four-year-old daughter, T.E.H., for more than a year. The state placed T.E.H. in the custody of her father, a convicted child predator. Gilbank alleged that the father admitted to touching T.E.H.'s genitals daily and that his admission led a state court to reverse the earlier custody decision and return T.E.H to her. With the custody battle over, Gilbank then turned to federal court and brought this suit for money damages, alleging that local officials violated her constitutional rights during the custody dispute.

A majority of the court agrees that Gilbank's lawsuit does not fall within the narrow parameters of the *Rooker-Feldman* doctrine because Gilbank's suit cannot and will not modify the since resolved custody judgment. See *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 293 (2005) (*Rooker-Feldman* applies only when a plaintiff asks a federal court to overturn or undo a state court judgment). Her damages suit does not seek to undo any state court judgment. Nor could it: ever since Gilbank regained custody of her daughter, the state custody proceedings have been closed. She could not appeal an order depriving her of custody after she regained custody. The case and the custody issue are over. Gilbank's federal suit, by contrast, can give her meaningful relief. Doing so might result in a federal court frowning upon the state court's conclusions. But that is decidedly not a *Rooker-Feldman* problem.

I

I will not belabor the points I made in *Hadzi-Tanovic v. Johnson*, 62 F.4th 394, 408–14 (7th Cir. 2023) (Kirsch, J., dissenting from the denial of rehearing en banc), but here is the short

of it: Congress has authorized only the Supreme Court to exercise appellate jurisdiction over state court judgments. 28 U.S.C. § 1257(a). The Court has enforced this statutory limit on the jurisdiction of lower federal courts just twice, in *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). These cases hold that district courts lack power to reverse a state court judgment at the request of a disgruntled plaintiff. See *Exxon*, 544 U.S. at 283 (noting that the plaintiffs in both *Rooker* and *Feldman* "essentially invited federal courts of first instance to review and reverse unfavorable state-court judgments").

*Exxon* itself was a response to lower courts' expansive misapplication of *Rooker-Feldman*. The Court clarified that § 1257(a)'s exception to federal jurisdiction applies only in those "limited circumstances," *id.* at 291, "where a party in effect seeks to take an appeal of an unfavorable state-court decision to a lower federal court," *Lance v. Dennis*, 546 U.S. 459, 466 (2006). *Exxon* provides the test: *Rooker-Feldman* "is confined to cases of the kind from which the doctrine acquired its name: [1] cases brought by state-court losers [2] complaining of injuries caused by state-court judgments [3] rendered before the district court proceedings commenced and [4] inviting district court review and rejection of those judgments." *Exxon*, 544 U.S. at 284. "Review and reject[]," the Court made clear, means that the plaintiff asks a federal court to "overturn" or "undo" the state court judgment. *Id.* at 287 n.2, 292–93. Only when every element is met does *Rooker-Feldman* enter the picture.

Judge Hamilton's dissent, however, reads *Exxon* wrong. *Ante*, at 21–25. Judge Hamilton concludes that, because the Supreme Court did not use "the language of legal precision"

in articulating the review and reject element, *Exxon* endorses an endlessly pliable "practical approach" to *Rooker-Feldman*. *Id.* at 22. The dissent leverages this purported flexibility to posit that *Exxon* requires attention to injuries alone—the relief sought in federal court is irrelevant. It follows, says the dissent, that any plaintiff complaining of injuries caused by a state court judgment inherently asks the federal court to review and reject that judgment. So understood, it is irrelevant whether the relief would or could have any effect on the state court judgment.

But the source of a plaintiff's injury is one, and only one, requirement. The key *Rooker-Feldman* inquiry is not simply whether a plaintiff's injury can be separated from the state court judgment that completed it but also whether the plaintiff asks a federal court to reverse a state court judgment. The practical approach of Judge Hamilton's dissent simply gives no independent meaning to this distinct requirement.

Courts in this circuit must, however, give due weight to all four elements of *Rooker-Feldman*. This requires a court to consider the relief requested in determining if the plaintiff has indeed asked the court to reject a state court judgment. *Exxon*, 544 U.S. at 291–93. And it is unlikely, though not impossible, that a plaintiff seeking damages, like Gilbank, has requested a court to do so: awarding damages usually does not affect a state court judgment not sounding in monetary terms.

## A

*Exxon*'s core focus is on *what* the plaintiff asks the federal court to do. The Supreme Court has repeatedly emphasized that *Rooker-Feldman* is confined to cases where the plaintiff asks the federal court to overturn a state court judgment. See

*Milchtein v. Chisholm*, 880 F.3d 895, 898 (7th Cir. 2018) ("The vital question" the Court asked in *Exxon* "is whether the federal plaintiff seeks the alteration of a state court's judgment."). In explaining the "limited circumstances" in which *Rooker-Feldman* applies, for example, *Exxon* described the only two plaintiffs to have ever lost at the Court under the doctrine: both "*called upon* the District Court to *overturn* an injurious state-court judgment." 544 U.S. at 291–92 (emphasis added). The Court later described the typical *Rooker-Feldman* plaintiff as a "loser in state court [who] *invites* [a] federal district court to *overturn* [a] state-court judgment." *Id.* at 287 n.2 (emphasis added). And in concluding that *Rooker-Feldman* did not bar Exxon's suit, the Court held that Exxon "plainly ha[d] not repaired to federal court to *undo* the [state court] judgment in its favor." *Id.* at 293 (emphasis added).

Our own cases—*Brokaw v. Weaver*, 305 F.3d 660 (7th Cir. 2002), and *Johnson v. Pushpin Holdings, LLC*, 748 F.3d 769 (7th Cir. 2014)—correctly recognize that identifying what the plaintiff has requested is the key *Rooker-Feldman* inquiry. *Brokaw* recognized that *Rooker-Feldman* did not bar suits alleging fraud in state custody proceedings when the plaintiff did not seek to set aside the custody judgment. 305 F.3d at 663, 666–68. Similarly, in *Pushpin*, we said that *Rooker-Feldman* "does not bar a federal suit that seeks damages for a fraud that resulted in a judgment adverse to the plaintiff" because "[s]uch a suit does not seek to disturb the judgment of the state court, but to obtain damages for the unlawful conduct that misled the court into issuing the judgment." 748 F.3d at 773. That is not mere "dicta," *ante*, at 27, as we explicitly addressed the damages issue to "end the appeal," *Pushpin*, 748 F.3d at 773. These cases do not stand for a "fraud exception" to *Rooker-Feldman*, *ante*, at 43–52, as there has never been such

an exception, see *Hadzi-Tanovic*, 62 F.4th at 412–13 (Kirsch, J., dissenting from the denial of rehearing en banc). Simply, *Brokaw* and *Pushpin* reflect the limits on *Rooker-Feldman* and make plain, in line with *Exxon*, that *Rooker-Feldman* does not apply when, given the relief sought, a plaintiff, like Gilbank, does not seek to reverse a state court judgment. *Brokaw*, 305 F.3d at 663, 666–68; *Pushpin*, 748 F.3d at 773.

Not only does our precedent support requiring courts to focus on the relief sought, but we are also in good company in doing so: other circuits recognize that the key question *Exxon* asks is whether the relief a plaintiff seeks would reverse a state court judgment. See *Hohenberg v. Shelby County*, 68 F.4th 336, 341 (6th Cir. 2023) ("[A] complaint demanding 'compensatory damages' does not 'seek review or reversal' of a court order awarding relief not measured by money.") (quotation omitted); *Behr v. Campbell*, 8 F.4th 1206, 1214 (11th Cir. 2021) (expressly rejecting the proposition that *Rooker-Feldman* "focus[es] on the federal claim's relationship to the issues involved in the state court proceeding, instead of on the type of relief sought by the plaintiff") (quotation omitted); *Webb ex rel. K.S. v. Smith*, 936 F.3d 808, 816 (8th Cir. 2019) ("An important consideration for a court confronted with the issue of whether *Rooker-Feldman* applies is to analyze 'the effect the requested federal relief would have on the state court judgment.'") (quotation omitted); *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 173 (3d Cir. 2010) ("[W]hile [the plaintiff's] claim for damages may require review of state-court judgments and even a conclusion that they were erroneous, those judgments would not have to be rejected or overruled for [the plaintiff] to prevail. Accordingly, the review and rejection requirement of the *Rooker-Feldman* doctrine is not met."); *Green v. Mattingly*, 585 F.3d 97, 102 (2d Cir. 2009) (*Rooker-Feldman* is

inapplicable to a damages suit based on custody proceedings when a child had been returned to the plaintiff because "the question of the validity of the temporary order of removal was likely moot and there was no basis for [the] plaintiff to appeal."); *Adkins v. Rumsfeld*, 464 F.3d 456, 464 (4th Cir. 2006) ("[T]he test [under *Exxon*] is not whether the relief sought in the federal suit 'would certainly upset' the enforcement of a state court decree, … but rather whether the relief would 're-verse or modify' the state court decree.") (quotation omitted).

The Tenth Circuit perhaps said it best:

> As the Supreme Court emphasized in *Exxon Mo-bil,* the *Rooker-Feldman* doctrine does not apply simply because a party attempts to litigate in federal court a matter previously litigated in state court. To the contrary, a party may lose in state court and then raise precisely the same legal issues in federal court, so long as the *relief sought* in the federal action would not reverse or undo the *relief granted* by the state court.

*Mo's Express, LLC v. Sopkin*, 441 F.3d 1229, 1237 (10th Cir. 2006) (cleaned up). We and our sister circuits understand *Exxon*'s core lesson: *Rooker-Feldman* applies only when a plaintiff seeks relief from a federal court that would reverse a state court judgment. And to the extent that some of our cases disregard that lesson and focus on a plaintiff's injury to the exclusion of the relief sought, they are "both inconsistent with Supreme Court precedent and out of step with our sister

circuits" and must not be followed. *United States v. Parker*, 508 F.3d 434, 436, 441 (7th Cir. 2007).[*]

Judge Hamilton concludes that, because *Exxon* used "many verbs" in illustrating the review and reject element, the Supreme Court did not mean what it said, and under a "practical approach," courts can safely ignore the review and reject element (and the relief a plaintiff has sought). *Ante*, at 22. For the dissent—based solely on an isolated phrase: "complaining of *injuries* caused by state-court judgments," *id.* at 24 (quoting *Exxon*, 544 U.S. at 284)—*Exxon* requires such an approach because its "focus … was more on the source of *injuries* than on the form of *relief*," *id.* Thus, asserts Judge Hamilton's dissent, once a court knows that the "injury underlying a claim was caused by the state-court judgment, … [r]edressing the injury—regardless of the form of relief requested—necessarily requires a federal court to review and reject the state-court judgment." *Id.* at 25.

The dissent's quasi-textual analysis holds no water: in both its holding and its explanation of *Rooker-Feldman*'s proper scope, *Exxon* spoke—expressly, repeatedly, and unambiguously—in terms of relief. On the dissent's read, *Rooker-Feldman* would bar all federal cases (1) brought by

---

[*] Contrary to Judge Hamilton's argument, the majority is not creating a new rule. *Ante*, at 37. Rather, we are cleaning up our case law and clearly articulating how *Exxon* is to be applied in our circuit. We are here because we overruled precedent in *Hadzi-Tanovic* that properly described *Rooker-Feldman*'s bounds (as *Brokaw* and *Pushpin* do) and continued the expansion of *Rooker-Feldman* in our circuit. 62 F.4th at 402 (Hamilton, J.). I warned then that the sprawl of our *Rooker-Feldman* doctrine reflected in our recent case law was "out of step with *Exxon*." *Id.* at 412 (Kirsch, J., dissenting from the denial of rehearing en banc).

state court losers (2) complaining of injuries caused by state court judgments that were (3) rendered before federal proceedings commenced. But *Exxon* did not stop there. When the Supreme Court tells us that a rule applies only when four elements are met, we do not read one of those requirements as superfluous. We must read *Exxon*'s test as giving some independent meaning to "and inviting district court review and rejection of those judgments." 544 U.S. at 284. The only way to do that is to look at the relief a plaintiff seeks—what the federal plaintiff "invite[s]" the district court to do. *Id.* at 283. If a plaintiff extends the invitation to undo, reverse, or overturn the state court judgment, *Rooker-Feldman* bars her case.

Unable to find sufficient support in *Exxon*, Judge Hamilton's dissent trots out a parade of horribles to justify its expansive view of *Rooker-Feldman*. *Ante*, at 35; see also *id.* at 31–36. It warns that the majority view would mean "federal courts could award damages every time a litigant in state court used an improper procedure or considered evidence that a federal judge does not think trustworthy." *Ante*, at 23–24 (quoting *Harold v. Steel*, 773 F.3d 884, 887 (7th Cir. 2014)). No, they couldn't. A federal court's jurisdiction to hear a case says nothing about its merits. Preclusion, immunity, abstention, and merits-focused defenses all impede a state court loser's path to damages, even if they will not guarantee a loss for every plaintiff who seeks to call a state court judgment into question. But they have nothing to do with jurisdiction, and applying them is the job of federal courts.

The dissent also misapprehends the role that relief plays in the application of the review and reject element. There is no "bright-line rule," as the dissent fears, that in all cases, "*Rooker-Feldman* does not apply to a federal claim for damages

based on an injury inflicted by a state-court judgment." *Ante*, at 21. Rather, a determination of whether a court is being called upon to review and reject a state court judgment must involve some comparison of the relief requested with the relief granted by the state court. *Hohenberg*, 68 F.4th at 341; *Sopkin*, 441 F.3d at 1237.

By way of example, in a case where the state-court judgment sounded in monetary relief, a plaintiff repairing to federal court pursuing refund or adjustment of the sum assessed against her could be seeking review and rejection of that judgment because the relief sought would nullify or modify the judgment. Indeed, in *Bauer v. Koester*, 951 F.3d 863 (7th Cir. 2020), a state court, in a foreclosure proceeding, issued a monetary judgment against the plaintiffs who then, in federal court, sought actual and punitive damages for alleged constitutional violations in that proceeding. *Id.* at 865–66. Though the plaintiffs only sought damages, their claim would be barred by *Rooker-Feldman* because awarding such damages would refund the money assessed against them and thereby void the judgment. See, e.g., *Fliss v. Generation Cap. I, LLC*, 87 F.4th 348, 353 (7th Cir. 2023) (suggesting that *Rooker-Feldman* bars actions seeking a refund of the damages assessed by the state court); *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 519 n.24 (10th Cir. 2023) (indicating that a claim for money damages seeking to recover the amount of debt imposed in the judgment of conviction would be barred); cf. *Gisslen v. City of Crystal, Minn.*, 345 F.3d 624, 627–28 (8th Cir. 2003) (finding that *Rooker-Feldman* bars a damages claim that challenges a state court's determination of just compensation for a taking). This clarification should mollify the dissent's fear of opening the courts to a flood of cases and "longer and more extensive litigation." *Ante*, at 34.

Even if the dissent's policy concerns stand, so what if our jurisdiction extends to these cases? The specter of federal courts exercising jurisdiction in the areas of mortgage foreclosure, family law, and other cases, *ante*, at 31, does not justify shirking the "virtually unflagging obligation" to exercise our jurisdiction, *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). And the dissent's concern about an increase in "friction between state and federal courts" cannot displace that obligation, especially when such friction is contemplated by our system of concurrent jurisdiction. *Ante*, at 36. We trust that courts can avoid any "increase" in that friction, not by refusing jurisdiction, but through rigorous application of the arsenal of doctrines that will stymy state-court losers from proceeding far in their federal suits. *Id.*

The Supreme Court shares neither Judge Hamilton's concerns nor a desire for a broader *Rooker-Feldman* doctrine. The Court has been clear: "Neither *Rooker* nor *Feldman* elaborated a rationale for a wide-reaching bar on the jurisdiction of lower federal courts, and our cases since *Feldman* have tended to emphasize the narrowness of the *Rooker-Feldman* rule." *Lance*, 546 U.S. at 464. And in nearly half a century, the Court "has never applied *Rooker-Feldman* to dismiss an action for want of jurisdiction." *Exxon*, 544 U.S. at 287; see also, e.g., *Reed v. Goertz*, 598 U.S. 230, 235 (2023); *Skinner v. Switzer*, 562 U.S. 521, 532–33 (2011).

The breadth of the dissent's position—and its incongruity with the Court's view—is clear when applied to the overlap between *Rooker-Feldman*'s bar and that of *Heck v. Humphrey*, 512 U.S. 477 (1994). See *Sanchez v. City of Chicago*, 880 F.3d 349, 356 (7th Cir. 2018) (identifying that both *Heck* and *Rooker-Feldman* can bar a challenge to a state court conviction).

Consider a plaintiff alleging malicious prosecution, a Fourth Amendment violation. *Heck* holds that 42 U.S.C. § 1983 does not authorize him to sue for that violation until his maliciously obtained conviction has been set aside. 512 U.S. at 486–89. But once that happens, the plaintiff can sue in federal court to remedy the violation of his constitutional rights. The approach in Judge Hamilton's dissent, however, would render *Heck*'s holding superfluous. If the dissent were correct, Roy Heck's § 1983 suit would have been dismissed at the outset on jurisdictional grounds under *Rooker-Feldman*—he was a state court loser complaining of injuries effectuated by his conviction. *Id.* at 478–79. But *Heck* is not jurisdictional. See, e.g., *Polzin v. Gage*, 636 F.3d 834, 837 (7th Cir. 2011) ("The *Heck* doctrine is not a jurisdictional bar."); *Garrett v. Murphy*, 17 F.4th 419, 427 (3d Cir. 2021) (collecting cases). Under the dissent's unyielding rule, district courts no longer need to (or even have jurisdiction to) invoke *Heck*. Instead, they must dismiss every suit complaining of injuries that contributed to a state court conviction, whether the conviction has been vacated or not. That is not the law.

B

Duly regarding, rather than brushing off, whether we have been asked to "review, reject, overturn, undo, reverse, set aside, [or] alter," *ante*, at 22, a state court judgment dictates the outcome here: given the status of the custody judgment and the relief she seeks, *Rooker-Feldman* does not bar Gilbank's claims. The return of her child resolved the state court judgment that effectuated Gilbank's alleged constitutional injuries. By giving meaning to each requirement of *Exxon*, particularly the fourth, our jurisdiction is secure because the state court proceedings are "over," "the state court['s] decisions are

not subject to review *anywhere*," and Gilbank, in requesting damages, "did not ask the district judge, and do[es] not ask us, to alter or annul any decision by a state judge." *Milchtein*, 880 F.3d at 897.

The Second and Sixth Circuits have provided the blueprint for resolving the very issue before us in accordance with *Exxon*. In *Green v. Mattingly*, 585 F.3d 97 (2d Cir. 2009), the plaintiff sued multiple state officials involved with temporarily removing her daughter from her custody, alleging that they had violated her constitutional rights. *Id.* at 99. The Second Circuit held that, under *Exxon*, *Rooker-Feldman* did not apply because the plaintiff's child had been returned to her: "The only conceivable 'judgment' against plaintiff—the temporary removal of her child—has already been undone." *Id.* at 102. In *Kovacic v. Cuyahoga County Department of Children and Family Services*, 606 F.3d 301 (6th Cir. 2010), the Sixth Circuit likewise held that *Rooker-Feldman* did not bar damages claims based on the conduct of the social workers that led to a custody judgment which was no longer in effect. *Id.* at 302–03. Because those plaintiffs sought only damages for alleged unconstitutional conduct, "any action concerning [the children's] return to their mother's custody became moot when they were reunited with their mother." *Id.* at 310. So too for Gilbank: after she regained full custody of her daughter, the custody dispute was over, and there was no state court judgment to appeal. And because there is no judgment upon which Gilbank can seek appellate review, § 1257(a)'s limit on appellate jurisdiction is irrelevant.

Yet Judge Hamilton's dissent maintains that its analysis is consistent with *Exxon* because Gilbank's claims invited the federal court to review and reject those since-resolved

custody orders. While paying (what one might generously call) lip service to the review and reject element, it finds we lack jurisdiction because Gilbank's "only alleged injury is the deprivation of custody itself, as ordered by the state trial court," and the "premise" of her claims is that "the state-court judgments were wrong, and there is no conceivable way to redress the [injury] without … reviewing and rejecting those state-court judgments as incorrect." *Ante*, at 23 (cleaned up). But *Exxon* squarely contradicts this approach: "If a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party …, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion.'" 544 U.S. at 293 (quoting *GASH Assocs. v. Rosemont*, 995 F.2d 726, 728 (7th Cir. 1993)).

Even if the premise of Gilbank's claims is that a state court judgment is wrong, and thereby she seeks to "put the Wisconsin trial court's proceedings under a microscope" by relitigating issues she raised or could have raised in that court, that is a question of state preclusion law. *Ante*, at 35. Indeed, preclusion requires a court to put prior proceedings, even state-court proceedings, "under a microscope," *id.*, to determine the issues that were actually litigated, *Waagner v. United States*, 971 F.3d 647, 657 (7th Cir. 2020). Courts can do so without calling judges as witnesses. And because *Rooker-Feldman* "is not simply preclusion by another name," *Lance*, 546 U.S. at 466; *Hohenberg*, 68 F.4th at 339, it does not preclude claims merely premised on challenges to a state court's decision. And that is true even if *Rooker-Feldman* might "offer a much better prospect" for courts to rid themselves of cases seeking to relitigate state court judgments than equitable doctrines of preclusion. *Ante*, at 32–34. The dissent's goal-oriented application

of *Rooker-Feldman* to suits premised on the incorrectness of state court judgments would encourage the federalization of state preclusion law, contravening the Court's admonishments. See *Exxon*, 544 U.S. at 283 (expressing concern that lower courts' expansive use of *Rooker-Feldman* was "superseding the ordinary application of preclusion law").

A determination that Gilbank's claims are not barred by *Rooker-Feldman* does not categorically reject its application to suits seeking money damages. In contrast to a damages award that would neutralize the money judgment issued in state court, such as in *Bauer*, awarding Gilbank damages could do nothing to the custody judgment because: (1) the custody dispute is over; and (2) even if it were not, the judgment provided equitable relief that an award of damages would not undo. This conclusion shows only that the relief Gilbank sought could not undo the custody determination and thus, under *Exxon*, her suit is beyond the reach of *Rooker-Feldman*.

## II

One final point. I agree with the majority's dismissal on the merits of the warrantless urinalysis claim, the Fifth Amendment right to counsel claim, and the due process claims, all of which the district court addressed on the merits and dismissed with prejudice. However, we cannot reach the merits of Gilbank's remaining claims. While we ordinarily may affirm the district court on any ground adequately supported by the record, see *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 972–73 (7th Cir. 2000), the merits of Gilbank's remaining claims that were solely dismissed under *Rooker-Feldman* are not properly before us. This is because "an appellee who does not cross-appeal may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the

rights of his adversary.'" *Jennings v. Stephens*, 574 U.S. 271, 276 (2015) (quotation omitted). And while dismissals based on a lack of subject matter jurisdiction are without prejudice, affirmance based on defendants' alternative merits arguments would require dismissal of Gilbank's claims with prejudice. *Bernstein v. Bankert*, 733 F.3d 190, 224 (7th Cir. 2013) ("The case law holds, consistent with Rule 41(b), that a dismissal for lack of subject matter jurisdiction cannot be a dismissal with prejudice."); Fed. R. Civ. P. 41(b). To enlarge their relief in this way, defendants needed to cross-appeal; they did not, which precludes our review. See *Bankert*, 733 F.3d at 224 ("[A]n appellee who wants, not that the judgment of the district court be affirmed on an alternative ground, but that the judgment be changed … from a dismissal without to a dismissal with prejudice, … must file a cross-appeal.") (cleaned up).

*        *        *

The state court took Gilbank's daughter from her. Gilbank has her daughter back. The custody dispute is over, and the state court judgment is not in effect. Because Gilbank never asked to reverse the state custody judgment, *Rooker-Feldman* does not bar her claims, and the district court had jurisdiction. Their dismissal on *Rooker-Feldman* grounds should therefore be reversed. This narrower view of *Rooker-Feldman* is how courts in this circuit will apply the doctrine going forward.

I concur in the dismissal, on the merits, of Gilbank's urinalysis, Fifth Amendment right to counsel, and due process claims. I respectfully dissent from the mandate affirming the dismissal of her remaining claims on *Heck* and *Rooker-Feldman* grounds.